UNITED STATES of America

v.

TEN EROTIC PAINTINGS Identified as George Brosz (SIC), Melle, Water Color, Japanese Painting on Silk, Peverelli, Painting on Crepe Paper, Karel Appel, Indian (SIC) Ink Drawing, Indian Painting, Chinese Painting, Chinese Painting, Hans Bellmen (SIC), Drawing, Anonymous French Etching.

Civ. No. 21453.

United States District Court,
D. Maryland.

March 5, 1970.

William S. Sessions and Robert G. Mahony, U. S. Department of Justice, Washington, D. C., for plaintiff.

Sheldon H. Braiterman and Michael J. Milton, Baltimore, Md., for claimants.

FRANK A. KAUFMAN, District Judge.

Acting under 19 U.S.C. § 1305,[1] the United States instituted this forfeiture proceeding against ten allegedly obscene paintings and drawings. Claimants, Dr. Eberhard Kronhausen and his wife, Dr. Phyllis Kronhausen,[2] the owners and collectors of the pictures, filed a motion to dismiss under Federal Civil Rule 12(b) (6) and a motion for summary judgment under Federal Civil Rule 56, contending that none of the objects is obscene and that section 1305 is both facially, and as applied in the present case, unconstitutional. The Government, in addition to opposing the claimants' two motions, has itself filed a motion for summary judgment.

The success of claimants' attack on the facial constitutionality of the statute is precluded in this Court by prior decisions of the Fourth Circuit and of this Court. United States v. 56 Cartons Containing 19,500 Copies of a Magazine Entitled "Hellenic Sun," 373 F.2d 635 (4th

---

1. The statute provides, in pertinent part:
 § 1305. *Immoral articles; prohibition of importation*

 (a) All persons are prohibited from importing into the United States from any foreign country * * * any obscene book, pamphlet, paper, writing, advertisement, circular, print, picture, drawing, or other representation, figure, or image on or of paper or other material, or any cast, instrument, or other article which is obscene or immoral * * *. No such articles whether imported separately or contained in packages with other goods entitled to entry, shall be admitted to entry; and all such articles and, unless it appears to the satisfaction of the collector that the obscene or other prohibited articles contained in the package were inclosed therein without the knowledge or consent of the importer; owner, agent, or consignee, the entire contents of the package in which such articles are contained, shall be subject to seizure and forfeiture as hereinafter provided: *Provided*, * * * *Provided further*, That the Secretary of the Treasury may, in his discretion, admit the so-called classics or books of recognized and established literary or scientific merit, but may, in his discretion, admit such classics or books only when imported for noncommercial purposes.

 Upon the appearance of any such book or matter at any customs office, the same shall be seized and held by the collector to await the judgment of the district court as hereinafter provided; and no protest shall be taken to the United States Customs Court from the decision of the collector. Upon the seizure of such book or matter the collector shall transmit information thereof to the district attorney of the district in which is situated the office at which such seizure has taken place, who shall institute proceedings in the district court for the forfeiture, confiscation, and destruction of the book or matter seized. Upon the adjudication that such book or matter thus seized is of the character the entry of which is by this section prohibited, it shall be ordered destroyed and shall be destroyed. Upon adjudication that such book or matter thus seized is not of the character the entry of which is by this section prohibited, it shall not be excluded from entry under the provisions of this section.

 In any such proceeding any party in interest may upon demand have the facts at issue determined by a jury and any party may have an appeal or the right of review as in the case of ordinary actions or suits.

 (b) * * *

 No question has been presented by either claimants or the Government concerning the possible effect of the *Provided further* clause of the statute, and the same is accordingly not dealt with in this opinion.

2. The Kronhausens hold doctorates in education and have engaged in psychological research and practice for more than fifteen years, specializing in family therapy and group guidance and engaging in the study of eroticism in art and literature, the authorship of publications about pornography and sex, and in assembling a collection of erotic art.

Cir.1967), aff'g 253 F.Supp. 498 (D.Md. 1966) (Thomsen, C. J.), rev'd on other grounds, *sub nom.* Potomac News Co. v. United States, 389 U.S. 47, 88 S.Ct. 233, 19 L.Ed.2d 46 (1967); United States v. 392 Copies of a Magazine Entitled "Exclusive," 373 F.2d 633 (4th Cir.1967), aff'g 253 F.Supp. 485 (D.Md.1966) (Thomsen, C. J.), rev'd on other grounds, *sub nom.* Central Magazine Sales v. United States, 389 U.S. 50, 88 S.Ct. 235, 19 L.Ed.2d 49 (1967). In *"Hellenic Sun,"* Judge Haynsworth, relying on the reasoning in the Second Circuit's opinion in United States v. One Carton Positive Motion Picture Film Entitled "491," 367 F.2d 889 (2d Cir.1966), and in Chief Judge Thomsen's opinion in *"Hellenic Sun," supra,* in this Court, stated (373 F.2d *supra* at 637) that "the statutory scheme [embodied in section 1305] appears to us to comply fully with the requirements of Freedman v. State of Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 * * * [1965]. * * *."

This Court is mindful of the teachings of Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); of the conclusion, that section 1305 is facially unconstitutional, recently reached by a three-judge District Court in the Ninth Circuit, United States v. Thirty-Seven (37) Photographs et al., 309 F. Supp. 36 (C.D.Cal., Jan. 27, 1970); and of Chief Judge Aldrich's views expressed in the majority opinion in a three-judge court case, Karalexis v. Byrne, 306 F.Supp. 1363 (D. Mass., Nov. 28, 1969). In *Karalexis,* involving an attack on the constitutionality of a Massachusetts obscenity statute, Judge Aldrich questioned the continuing validity of the standards in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L. Ed.2d 1498 (1957), despite the Supreme Court's statement in *Stanley* that the re-

sult and the language in that latter opinion did not affect the *Roth* doctrine. In the three judge Ninth Circuit case, Judge Ferguson seems to have concluded that "*Stanley* means more than" simply that "the First Amendment prohibits the making of mere private possession of obscene material a crime" (309 F. Supp. at p. 37). But in a post-*Stanley* opinion in United States v. Melvin, 419 F.2d 136 (4th Cir., Dec. 2, 1969), involving a conviction under an indictment charging violation of 18 U.S.C. § 1462 for knowingly taking and receiving from a common carrier certain obscene materials which had been carried interstate, the Fourth Circuit, in affirming that conviction, held the statute there involved facially constitutional. Judge Sobeloff noted in *Melvin* that in *Stanley,* upon which the constitutional attack in *Melvin* was in part based, "the Supreme Court merely struck down a statute as unconstitutional insofar as it made criminal the mere private possession of obscene material in one's own home. The decision did not deal with congressional power to regulate the interstate transportation of obscene material by common carrier" (in *Melvin,* 419 F.2d, p. 139). And, most assuredly, *Stanley* in no way dealt with congressional power to regulate importation into this country of obscene material. Accordingly, this Court rejects claimants' contention that section 1305 is facially unconstitutional.

The question of whether procedural or other delay has rendered unconstitutional in this case the application of section 1305 is not before this Court in the present factual context of this proceeding. Claimants have either themselves requested, or agreed to, the time lapses which have occurred in this case since the institution of the proceedings in this Court.[3]

---

3. The last affidavits were filed by claimants on February 13, 1970. Between that date, and the institution of these proceedings on November 24, 1969, all lapses related to time required for presentation of legal memoranda; the securing, preparation and filing of affidavits; and the inspection of the pictures or of reprod⋅c-

tions of them by one or more of the authors of such affidavits. No delay resulted from the posing of interrogatories by the Government and the answering of those interrogatories by claimants after their principal objections were overruled. *See* n. 5 *infra.*

■ The standards for determining whether the ten pictures, or any of them, are obscene, have been set forth by the Supreme Court in A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of the Commonwealth of Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), in which Mr. Justice Brennan wrote:

> We defined obscenity in *Roth* in the following terms: "[W]hether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." 354 U.S., at 489, 77 S.Ct. 1304 at 1311. Under this definition, as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value. [at 418, 86 S.Ct. at 977].

\* \* \* \* \* \*

The Supreme Judicial Court [of Massachusetts] erred in holding that a book need not be "unqualifiedly worthless before it can be deemed obscene." A book cannot be proscribed unless it is found to be *utterly* without redeeming social value. This is so even though the book is found to possess the requisite prurient appeal and to be patently offensive. Each of the three federal constitutional criteria is to be applied independently; · the social value of the book can neither be weighed against nor canceled by its prurient appeal or patent offensiveness. Hence, even on the view of the court below that Memoirs possessed only 'a modicum of social value, its judgment must be reversed as being founded on an erroneous interpretation of a federal constitutional standard. [at 419–420, 86 S.Ct. at 978; footnote omitted].

Thus, in order for an item to be constitutionally obscene, all three elements must be present and coalesce.

The ten pictures involved in this case include one by George Grosz (1893–1959), and four by contemporary European artists.[4] There is one anonymous

4. Grosz, born in Germany, became an American citizen in 1938. He has been described as "one of the bitterest caricaturists of the German bourgeoisie and military clique" in the years after World War I. The History of Modern Painting from Picasso to Surrealism, 115b (Skira, Geneva, 1950). *See also* 3 McGraw-Hill Dictionary of Art, 17 (New York, 1969); Sachs, Modern Prints & Drawings, 251 (Knopf, New York, 1954).

The four living European artists are Karel Appel, Hans Bellmer, Melle, and Cesare Peverelli.

Appel, born 1921 in the Netherlands, the winner of the First Prize for Painting at the Pittsburgh International (1958), has paintings in the permanent collections of the Stedlelijk Museum, Amsterdam and the Tate Gallery, London. Who's Who in Art, 13 (14th ed. London, 1968). Appel painted murals for the Dutch Pavillion at the 1958 World's Fair at Brussels and for the UNESCO Building in Paris. "Appel's heavily textured canvases with their waves of swirling forms in bright contrasting colors are

charged with an elemental and explosive energy that recalls the last paintings of Van Gogh. \* \* \*" 1 McGraw-Hill Dictionary of Art, 146 (ed. Bernard S. Myers, New York, 1969).

Bellmer, born 1902 in Germany, an artist closely linked to the surrealist school, "Surrealism," 13 McGraw-Hill Enyclopedia of World Art, col. 733 (New York, 1967), is described in an article by Jelenski, "Hans Bellmer or the Displaced Pain," 38 Arts Magazine, 46, 50 (March, 1964), as "one of the great artists of our time. \* \* \* Bellmer's work brings to its uttermost concentration the false alternative between 'form' and 'content.' At the same time, it calls into question all our prejudices about 'Modern Art.'"

Melle, born 1908 in the Netherlands, is described as little known outside of Europe and "perhaps the most individualistic of all Dutch painters." "His fantastic dreams in very suggestive colours show him as a late descendant of Hieronymus Bosch, whilst to British readers he might best be described as having some affinity to William Blake. The maniacal

18th century French etching, and one Indian, one Japanese and two Chinese works, including a Ming scroll. The ten objects are part of a collection of over 1000 pieces of erotic art, including paintings by Rembrandt and Picasso, assembled by claimants who are also the authors of the book, "Erotic Art," published in January, 1969 by Grove Press, with approximately 40 color and 400 black and white plates of objects in that collection. That book, which has been sold in leading book stores throughout the United States, including Baltimore, relates and refers to a museum exhibit in Sweden of the collection in May, June and July, 1968. The collection was later exhibited in a Danish museum in September and October, 1968, and in a second Swedish museum in April and May, 1969. The themes and subjects of the pictures in the collection are erotic. In many, including some of the ten pictures in this proceeding, there are explicit portrayals of sexual acts. A calendar, which included reproductions of thirteen of the pictures in the collection (one was of the Chinese Ming scroll which is among the ten objects in this case), was examined and admitted in New York by the U.S. Customs Bureau in March, 1969.

In June, 1969, an attorney representing claimants wrote to the Customs Bureau in Washington, D. C. requesting a ruling concerning importation and showing of the collection and asking that the items be returned and not forfeited in the event of their seizure. In October, 1969, the Customs Bureau replied, refusing to give any ruling in advance of attempted entry. Ten of the items in the collection were thereafter airshipped to Baltimore, arriving on or about October 23, 1969. On November 4, 1969, the Customs Bureau seized the ten pictures and on November 24, 1969, the Government commenced the within section 1305 proceeding.

In answers to interrogatories posed by the Government,[5] claimants have stated that no agreements have been entered into for any specific exhibitions of the collection in the United States, but that if showing in this country is permitted, it will probably take place in New York City unless a suitable location is not

---

repetition of the phallic symbolism render his pictures and many of his drawings crude, though hundreds of details showing animals and especially plants would each make a wonderful picture in itself. As a designer he is unsurpassed in his landscapes, where just a few indications of flowers or little creatures surrounded by an enormous space, put him on a plane with the best Chinese drawings and paintings. Boas, "Recent Trends in Dutch Painting," 155 The Studio 2, 6 (Jan., 1958).

Peverelli, born 1922 in Italy, has works which are the subject of numerous reviews in European art journals, 12 Art Index, 1959–1961 at 710–11 (H. W. Wilson, New York); 13 id., 1961–1963 at 712; 14 id., 1963–1965 at 771. One of his canvases is described as "one of this year's outstanding exhibits. * * * Peverelli obtains a remarkable feeling of depth and space in his monochromatic penumbrant paintings. * * * My only criticism about this individual technique which he uses to evoke his fleeting vision of the female form and of couples in a state of ecstasy, is that it may tend to become tiresome if pursued too far."

Watt, "Show at the Galerie Le Point Cardinal," 166 The Studio 121 (Sept., 1963). See also Chevalier, "Les Peintres Italiens de Paris," 9 Aujord'hui, 73 (Jan., 1965) ; Hoctin, "Les Paradisiers de Peverelli," 25 Vingtième Siècle 20–22 (Dec. 1963).

5. Claimants objected to the Government being permitted to propound written interrogatories under Federal Civil Rule 33 on the ground, inter alia, that the time consumed by such discovery would constitute unreasonable delay. This Court, in overruling those objections, noted that claimants themselves had asked to be permitted more than three weeks to file additional Rule 56 materials. In actual fact, the claimants' answers to the Government's interrogatories were filed about one month before claimants presented the last of their affidavits. Whether discovery under Rule 33 or other discovery should be permitted in a section 1305 case in which such discovery would cause delay or in which claimants themselves have not moved for summary judgment under Rule 56 presents questions which this Court need not and does not reach herein.

there available, in which event other metropolitan areas will be considered. In other responses to interrogatories, claimants have also stated that at any such showing no minors will be admitted, no pictures will be displayed in any windows, and no pandering will be permitted.

The Government's position—that each of the ten pictures is obscene—is supported only by the Government's conclusory characterization of the pictures and by the single affidavit of a psychiatrist in active practice in Washington, D. C. who has published at least one book and more than one hundred articles on psychiatry, including some on sexual and deviant behavior. He viewed photographs of all of the ten pictures and expressed the opinion that the "sexual representations contained" in eight of them "would, to the average adult, appeal to prurient interest" and "exceed contemporary community standards in matters relating to sex." He stated that photographs of two of the paintings "are not of sufficient clarity for me to form an opinion of any sexual representation contained therein."

Affidavits filed by claimants included those of the director of the Baltimore Museum of Art; two teachers of art at the Maryland Institute of Art; a professional artist active in art affairs; an officer of a Baltimore art gallery; a scholar and author in the field of Japanese culture; one Baltimore psychiatrist associated with Johns Hopkins Hospital and Medical School; two psychologists, one associated with the University of Maryland Medical School and the other with Johns Hopkins Medical School; and two Baltimore attorneys who in the recent past, as federal and state prosecutors, have been responsible for the handling of cases involving violations of federal and state obscenity laws. *Inter*

*alia*, the two attorneys expressed opinions that none of the pictures offended contemporary community standards. The affying art teachers and artists stated that the pictures, and each of them, are works of art of varying degrees of importance as objects of art, and that none of the ten affronts contemporary community standards or has a dominant appeal to prurient interest. The psychiatrist wrote that the effect of those pictures (which he examined in the book, Erotic Art) from the collection of which the ten pictures are a part, "is to intrigue, and frequently to startle, rather than to stimulate" and that for adults, but not the young, the collection has "a potential for reassurance against a number of sexual fears that are frequently found." One of the psychologists, after postulating that non-sexual images often communicate sexual ideas and emotions, set forth what he characterized as the less frequently heard "opposite but equally valid assertion: that sexual images are frequently used to communicate non-sexual ideas and emotions." Analyzing each of the pictures, he pointed out that four of them are "executed in oriental styles which are outside Western cultural tradition" and "should be viewed as *cultural artifacts*"; and that each of the other six communicate moods or ideas other than those dominantly sexual, and in one or two instances seem to have been "designed to repel" or to " 'turn off' any kind of sexual arousal." (Emphasis in original).

The other psychologist,[6] who has "worked extensively in psychological counseling and guidance of children with physical and psychological problems of sex" and who has been in charge of, or active in connection with the handling of, art exhibitions at the Johns Hopkins University Medical Residence since 1959,

---

6. That psychologist, who is the only affiant for either side in this case who viewed the originals rather than merely photographs of them and/or the reproductions of several of them in the Kronhausen book, Erotic Art, wrote: "The difference is like the proverbial difference between chalk and cheese. It is the difference between seeing the Mona Lisa in the Louvre instead of on a cheap, post card. * * *"

concluded that he found none of the three standards set forth in *Roth* was violated.

The Government argues that, at the very least, all of the motions pending in this case should be denied because there are present genuine issues of material fact. But while the lone affidavit filed by the Government and the nature of the case itself may set forth factual questions concerning prurient appeal and contemporary standards which should not be determined in a summary judgment context, the Government has presented no factual basis to support a determination by any fact finder that any one of the ten pictures [7] is "utterly without redeeming social value" (*Memoirs, supra* 383 U.S. at 418, 86 S.Ct. at 978 quoted *supra*) or " 'utterly' without

social importance," Jacobellis v. Ohio, 378 U.S. 184, 191, 83 S.Ct. 28, 9 L.Ed.2d 52 (1964). In addition, a one-by-one examination and study of the ten pictures even by a nonexpert in art, the credentials of the creators of five of those pictures, and the opinions of the experts expressed in the affidavits filed by claimants, almost conclusively establish that none of them can be said to be "utterly without redeeming [artistic] value." [8] On such a record, summary judgment cannot be successfully resisted by the Government's holding back until trial of opinion or other evidence that any one of the ten pictures is completely lacking in social value.[9]

In Redrup v. State of New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967), the Supreme Court noted (at 769, 87 S.Ct. at 1415) the absence of (a)

---

7. Claimants originally seemed to take the position that the entire Kronhausen collection was before the Court in this proceeding. The Government pointed out that the only objects before the Court herein were ten in number in the context of a proceeding *in rem.* Thereupon, claimants responded that they recognized that the jurisdiction of this Court in this case, under the existing pleadings and state of the record, was limited to the ten pictures and this Court's ruling will be *res judicata* only as to them. Claimants informed this Court on February 4, 1970 that they had decided not to seek, "by way of counterclaim for declaratory judgment or otherwise, to extend the Court's jurisdiction in this proceeding over the balance of the collection presently in Europe."

8. Nor do the pictures themselves nor any of the evidence before this Court permit the classification of any of the ten pictures as "hard-core pornography" as defined by Mr. Justice Stewart in Ginzburg v. United States, 383 U.S. 463, 499, 86 S.Ct. 942, 16 L.Ed.2d 31 n. 3 (1966); or the characterization of any of them as possessing "no pretense of * * * [artistic] value." *See also* Jacobellis v. Ohio, *supra* at 197, 83 S.Ct. 28.

9. Rule 56(e) provides, in part:
 When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading but his· response, by affidavits or as otherwise provided

in this rule, must set forth specific facts showing that there is a genuine issue for trial. * * *

* * * * *

* * * [I]f the moving party by affidavit or otherwise presents materials which would require a directed verdict in his favor, if presented at trial, then he is entitled to summary judgment unless the opposing party either shows that affidavits are then unavailable to him, or he comes forward with some materials by affidavit or otherwise, that show there is a triable issue of material fact. He need not, of course, show that the issue would be decided in his favor. But he may not hold back his evidence until trial; he must present sufficient materials to show that there is a triable issue. [6 J. Moore, Fed.Prac. § 56:11 [3], 2171–74 (2d ed. 1966); citations omitted].

This would also appear to be a case in which note should be taken of the following remarks of Mr. Justice Harlan, concurring in the result in Alberts v. California, 354 U.S. 476, 497–498, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (decided in the opinion which is generally cited under the name of Roth v. United States, *supra*), and dissenting in the *Roth* case itself:

* * * Every communication has an individuality and "value" of its own. The suppression of a particular writing or other tangible form of expression is, therefore, an *individual* matter, and in the nature of things every such suppression raises an individual constitu-

any "claim that the statute in question reflected a specific and limited state concern for juveniles," (b) "any suggestion of an assault upon individual privacy by publication in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it," and (c) any "evidence of the sort of 'pandering' which the Court found significant in Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 [1966]." Assuming, without deciding, that the presence of any one of the three *Redrup* elements could, in the face of this Court's conclusion that the *Roth* tests are not met, sustain seizure and forfeiture under section 1305,[10] there is

tional problem, in which a reviewing court must determine for *itself* whether the attacked expression is suppressable within constitutional standards. Since those standards do not readily lend themselves to generalized definitions, the constitutional problem in the last analysis becomes one of particularized judgments which appellate courts must make for themselves.

I do not think that reviewing courts can escape this responsibility by saying that the trier of the facts, be it a jury or a judge, has labeled the questioned matter as "obscene," for, if "obscenity" is to be suppressed, the question whether a particular work is of that character involves not really an issue of fact but a question of constitutional *judgment* of the most sensitive and delicate kind. Many juries might find that Joyce's "Ulysses" or Bocaccio's "Decameron" was obscene, and yet the conviction of a defendant for selling either book would raise, for me, the gravest constitutional problems, for no such verdict could convince me, without more, that these books are "utterly without redeeming social importance." In short, I do not understand how the Court can resolve the constitutional problems now before it without making its own independent judgment upon the character of the material upon which these convictions were based. I am very much afraid that the broad manner in which the Court has decided these cases will tend to obscure the peculiar responsibilities resting on state and federal courts in this field and encourage them to rely on easy labeling and jury verdicts as a substitute for facing up to the tough individual problems of constitutional judgment involved in every obscenity case. [Emphasis in original.] *See also* Mr. Justice Harlan's opinion in Manual Enterprises v. Day, 370 U.S. 478, 488, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962).

However, since claimants are entitled to summary judgment herein for reasons stated *supra* in the body of this opinion and in this footnote, it is not necessary in this case for this Court to make any findings of fact in any context other than pursuant to Rule 56. In that latter context, this Court concludes that there are no disputed facts in this case with regard to the question of whether any one or more of the ten pictures are "utterly without redeeming social value."

10. One of the grounds upon which claimants objected to the Government's interrogatories (see n. 5 *supra*) was that it is not appropriate for any inquiry to be made into the possible existence of a *Redrup* barrier in a section 1305 proceeding. In support thereof, claimants cite the joint opinion of Judges Thomsen and Northrop in this Court in United States v. 127,295 Copies of Magazines, etc., 295 F.Supp. 1186 (D.Md.1968), and the en banc opinion of this Court in United States v. 4,400 Copies of Magazines, 276 F.Supp. 902 (D.Md.1967). In those cases, this Court noted (295 F.Supp. *supra* at 1189; 276 F.Supp. *supra* at 904) that in view of the fact that the magazines involved had not yet been admitted into the United States, this Court could not be sure whether they would be marketed in contravention of any of the three *Redrup* standards, despite the additional fact that in the 1968 case, this Court noted (at 1189):

The government offered in this case circulars distributed by mail by a California company associated with the importer herein. These circulars, and the interior envelope in which they were contained, which advertise some of the same magazines issues involved in this case, make it highly probable that these magazines will be merchandized by a blatant appeal to prurient interest.

Had claimants' response to the Government's interrogatories revealed specific agreements or definite plans (as contrasted with probabilities or possibilities) for the handling of any one of the ten pictures in a manner violative of any one of the three *Redrup* tests, this Court would then have been faced with the question of whether that evidence could support a bar to entry and/or forfeiture in a section 1305 proceeding. The responses

not only absent here, as in *Redrup*, any claim, suggestion or evidence of facts supporting any such presence, but claimants, in response to the Government's interrogatories, have stated that they contemplate museum exhibitions to which minors would not be permitted entry and in connection with which there would be neither pandering, nor window display to be seen by those not desirous of viewing all or part of the collection.

*Roth, Redrup* and their progeny dictate the conclusion herein that none of the ten pictures is obscene. Thus, their entry into the United States cannot be barred under section 1305. For the reasons set forth in this opinion, the Government's motion for summary judgment is denied, the claimants' motion for dismissal under Rule 12(b) (6) is denied,[11] and the claimants' motion for summary judgment is granted. The Court will enter an appropriate order.

of claimants to those interrogatories make it unnecessary, however, for this Court to answer that question herein.

11. Claimants' Rule 12(b) (6) motion, except to the extent that it rests upon the contention of facial unconstitutionality of section 1305, which contention is not accepted by this Court, is treated as a Rule 56 motion since "matters outside the pleadings" (see the last sentence of Rule 12(b)) are presented by both claimants and the Government. Claimants, in sup-

port of their Rule 12(b) (6) motion, have cited United States v. 127,295 Copies of Magazines, etc., *supra* at n. 10; and United States v. 4,400 Copies of Magazines, *supra* at n. 10, in which Rule 12 (b) (6) motions were granted on the grounds that the publications therein were not obscene under the *Roth* standards. But in neither of those two cases did claimants file and press a motion for summary judgment under Rule 56 as did claimants—and the Government—herein.