## UNITED STATES *v.* THIRTY-SEVEN (37) PHOTOGRAPHS (LUROS, CLAIMANT)

No. 133.   Argued January 20, 1971—Decided May 3, 1971

WHITE, J., announced the Court's judgment and delivered an opinion in which (as to Part I) BURGER, C. J., and HARLAN, BRENNAN, STEWART, and BLACKMUN, JJ., joined, and in which (as to Part II), BURGER, C. J., and BRENNAN and BLACKMUN, JJ., joined. HARLAN, J., *post*, p. 377, and STEWART, J., *post*, p. 378, filed opinions concurring in the judgment and concurring in Part I of WHITE, J.'s opinion. BLACK, J., filed a dissenting opinion, in which DOUGLAS, J., joined, *post*, p. 379. MARSHALL, J., filed a dissenting opinion, *ante*, p. 360.

*Solicitor General Griswold* argued the cause for the United States. With him on the brief were *Assistant Attorney General Wilson* and *Roger A. Pauley.*

*Stanley Fleishman* argued the cause for appellees. With him on the brief was *Sam Rosenwein.*

MR. JUSTICE WHITE announced the judgment of the Court and an opinion in which THE CHIEF JUSTICE, MR. JUSTICE BRENNAN, and MR. JUSTICE BLACKMUN join.*

When Milton Luros returned to the United States from Europe on October 24, 1969, he brought with him in his luggage the 37 photographs here involved. United States customs agents, acting pursuant to § 305 of the Tariff Act of 1930, as amended, 46 Stat. 688, 19 U. S. C. § 1305 (a),[1]

*MR. JUSTICE HARLAN and MR. JUSTICE STEWART also join Part I of the opinion.

[1] 19 U. S. C. § 1305 (a) provides in pertinent part:

"All persons are prohibited from importing into the United States from any foreign country . . . any obscene book, pamphlet, paper, writing, advertisement, circular, print, picture, drawing, or other representation, figure, or image on or of paper or other material, or any cast, instrument, or other article which is obscene or immoral . . . . No such articles whether imported separately or contained in packages with other goods entitled to entry, shall be admitted to entry; and all such articles and, unless it appears to the satisfaction of the collector that the obscene or other prohibited articles contained in the package were inclosed therein without the knowledge or consent of the importer, owner, agent, or consignee, the entire contents of the package in which such articles are contained, shall be subject to seizure and forfeiture as hereinafter provided . . . . *Provided, further,* That the Secretary of the Treasury may, in his discretion, admit the so-called classics or books of recognized and established literary or scientific merit, but may, in his discretion, admit such classics or books only when imported for noncommercial purposes.

"Upon the appearance of any such book or matter at any customs office, the same shall be seized and held by the collector to await the judgment of the district court as hereinafter provided; and no protest shall be taken to the United States Customs Court from the decision of the collector. Upon the seizure of such book or matter the collector shall transmit information thereof to the district attorney of the district in which is situated the office at which such seizure has taken place, who shall institute proceedings in the district court for the forfeiture, confiscation, and destruction of the book or matter seized. Upon the adjudication that such book or matter

seized the photographs as obscene. They referred the matter to the United States Attorney, who on November 6 instituted proceedings in the United States District Court for forfeiture of the material. Luros, as claimant, answered, denying the photographs were obscene and setting up a counterclaim alleging the unconstitutionality of § 1305 (a) on its face and as applied to him. He demanded that a three-judge court be convened to issue an injunction prayed for in the counterclaim. The parties stipulated a time for hearing the three-judge court motion. A formal order convening the court was entered on November 20. The parties then stipulated a briefing schedule expiring on December 16. The court ordered a hearing for January 9, 1970, also suggesting the parties stipulate facts, which they did. The stipulation revealed, among other things, that some or all of the 37 photographs were intended to be incorporated in a hard cover edition of The Kama Sutra of Vatsyayana, a widely distributed book candidly describing a large number of sexual positions. Hearing was held as scheduled on January 9, and on January 27 the three-judge court filed its judgment and opinion declaring § 1305 (a) unconstitutional and enjoining its enforcement against the 37 photographs, which were ordered returned to Luros. 309 F. Supp. 36 (CD Cal. 1970). The judgment of invalidity rested on two grounds: first, that the section failed to comply with the procedural requirements of

thus seized is of the character the entry of which is by this section prohibited, it shall be ordered destroyed and shall be destroyed. Upon adjudication that such book or matter thus seized is not of the character the entry of which is by this section prohibited, it shall not be excluded from entry under the provisions of this section.

"In any such proceeding any party in interest may upon demand have the facts at issue determined by a jury and any party may have an appeal or the right of review as in the case of ordinary actions or suits."

*Freedman* v. *Maryland,* 380 U. S. 51 (1965), and second, that under *Stanley* v. *Georgia,* 394 U. S. 557 (1969), § 1305 (a) could not validly be applied to the seized material. We shall deal with each of these grounds separately.

## I

In *Freedman* v. *Maryland, supra,* we struck down a state scheme for administrative licensing of motion pictures, holding "that, because only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid final restraint." 380 U. S., at 58. To insure that a judicial determination occurs promptly so that administrative delay does not in itself become a form of censorship, we further held, (1) there must be assurance, "by statute or authoritative judicial construction, that the censor will, within a specified brief period, either issue a license or go to court to restrain showing the film"; (2) "[a]ny restraint imposed in advance of a final judicial determination on the merits must similarly be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution"; and (3) "the procedure must also assure a prompt final judicial decision" to minimize the impact of possibly erroneous administrative action. *Id.,* at 58–59.

Subsequently, we invalidated Chicago's motion picture censorship ordinance because it permitted an unduly long administrative procedure before the invocation of judicial action and also because the ordinance, although requiring prompt resort to the courts after administrative decision and an early hearing, did not assure "a prompt judicial decision of the question of the alleged obscenity of the film." *Teitel Film Corp.* v. *Cusack,* 390 U. S. 139, 141 (1968). So, too, in *Blount* v. *Rizzi,* 400 U. S. 410

(1971), we held unconstitutional certain provisions of the postal laws designed to control use of the mails for commerce in obscene materials. Under those laws an administrative order restricting use of the mails could become effective without judicial approval, the burden of obtaining prompt judicial review was placed upon the user of the mails rather than the Government, and the interim judicial order, which the Government was permitted, though not required, to obtain pending completion of administrative action, was not limited to preserving the status quo for the shortest fixed period compatible with sound judicial administration.

As enacted by Congress, § 1305 (a) does not contain explicit time limits of the sort required by *Freedman, Teitel,* and *Blount*.[2] These cases do not, however, require that we pass upon the constitutionality of § 1305 (a), for it is possible to construe the section to bring it in harmony with constitutional requirements.

---

[2] The United States urges that we find time limits in 19 U. S. C. §§ 1602 and 1604. Section 1602 provides that customs agents who seize goods must "report every such seizure immediately" to the collector of the district, while § 1604 provides that, once a case has been turned over to a United States Attorney, it shall be his duty "immediately to inquire into the facts" and "forthwith to cause the proper proceedings to be commenced and prosecuted, without delay," if he concludes judicial proceedings are appropriate. We need not decide, however, whether §§ 1602 and 1604 can properly be applied to cure the invalidity of § 1305 (a), for even if they were applicable, they would not provide adequate time limits and would not cure its invalidity. The two sections contain no specific time limits, nor do they require the collector to act promptly in referring a matter to the United States Attorney for prosecution. Another flaw is that § 1604 requires that, if the United States Attorney declines to prosecute, he must report the facts to the Secretary of the Treasury for his direction, but the Secretary is under no duty to act with speed. The final flaw is that neither section requires the District Court in which a case is commenced to come promptly to a final decision.

It is true that we noted in *Blount* that "it is for Congress, not this Court, to rewrite the statute," 400 U. S., at 419, and that we similarly refused to rewrite Maryland's statute and Chicago's ordinance in *Freedman* and *Teitel*. On the other hand, we must remember that, "[w]hen the validity of an act of the Congress is drawn in question, and . . . a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932). Accord, *e. g., Haynes* v. *United States*, 390 U. S. 85, 92 (1968) (dictum); *Schneider* v. *Smith*, 390 U. S. 17, 27 (1968); *United States* v. *Rumely*, 345 U. S. 41, 45 (1953); *Ashwander* v. *Tennessee Valley Authority*, 297 U. S. 288, 348 (1936) (Brandeis, J., concurring). This cardinal principle did not govern *Freedman, Teitel*, and *Blount* only because the statutes there involved could not be construed so as to avoid all constitutional difficulties.

The obstacle in *Freedman* and *Teitel* was that the statutes were enacted pursuant to state rather than federal authority; while *Freedman* recognized that a statute failing to specify time limits could be saved by judicial construction, it held that such construction had to be "authoritative," 380 U. S., at 59, and we lack jurisdiction authoritatively to construe state legislation. Cf. *General Trading Co.* v. *State Tax Comm'n*, 322 U. S. 335, 337 (1944). In *Blount*, we were dealing with a federal statute and thus had power to give it an authoritative construction; salvation of that statute, however, would have required its complete rewriting in a manner inconsistent with the expressed intentions of some of its authors. For the statute at issue in *Blount* not only failed to specify time limits within which judicial proceedings must be instituted and completed; it also failed to give any authorization at all to the administrative

agency, upon a determination that material was obscene, to seek judicial review. To have saved the statute we would thus have been required to give such authorization and to create mechanisms for carrying it into effect, and we would have had to do this in the face of legislative history indicating that the Postmaster General, when he had testified before Congress, had expressly sought to forestall judicial review pending completion of administrative proceedings. See 400 U. S., at 420 n. 8.

No such obstacles confront us in construing § 1305 (a). In fact, the reading into the section of the time limits required by *Freedman* is fully consistent with its legislative purpose. When the statute, which in its present form dates back to 1930, was first presented to the Senate, concern immediately arose that it did not provide for determinations of obscenity to be made by courts rather than administrative officers and that it did not require that judicial rulings be obtained promptly. In language strikingly parallel to that of the Court in *Freedman,* Senator Walsh protested against the "attempt to enact a law that would vest an administrative officer with power to take books and confiscate them and destroy them, because, in his judgment, they were obscene or indecent," and urged that the law "oblige him to go into court and file his information there . . . and have it determined in the usual way, the same as every other crime is determined." 72 Cong. Rec. 5419. Senator Wheeler likewise could not "conceive how any man" could "possibly object" to an amendment to the proposed legislation that required a customs officer, if he concluded material was obscene, to "tur[n] it over to the district attorney, and the district attorney prosecutes the man, and he has the right of trial by jury in that case." 71 Cong. Rec. 4466. Other Senators similarly indicated their aversion to censorship "by customs clerks and bureaucratic officials," *id.,* at 4437 (remarks of Sen.

Dill), preferring that determinations of obscenity should be left to courts and juries. See, *e. g., id.,* at 4433–4439, 4448, 4452–4459; 72 Cong. Rec. 5417–5423, 5492, 5497. Senators also expressed the concern later expressed in *Freedman* that judicial proceedings be commenced and concluded promptly. Speaking in favor of another amendment, Senator Pittman noted that a customs officer seizing obscene matter "should *immediately* report to the nearest United States district attorney having authority under the law to proceed to confiscate . . . ." *Id.,* at 5420 (emphasis added). Commenting on an early draft of another amendment that was ultimately adopted, Senator Swanson noted that officers would be required to go to court "immediately." *Id.,* at 5422. Then he added:

> "The *minute* there is a suspicion on the part of a revenue or customs officer that a certain book is improper to be admitted into this country, he presents the matter to the district court, and there will be a *prompt* determination of the matter by a decision of that court." *Id.,* at 5424 (emphasis added).

Before it finally emerged from Congress, § 1305 (a) was amended in response to objections of the sort voiced above: it thus reflects the same policy considerations that induced this Court to hold in *Freedman* that censors must resort to the courts "within a specified brief period" and that such resort must be followed by "a prompt final judicial decision . . . ." 380 U. S., at 59. Congress' sole omission was its failure to specify exact time limits within which resort to the courts must be had and judicial proceedings be completed. No one during the congressional debates ever suggested inclusion of such limits, perhaps because experience had not yet demonstrated a need for them. Since 1930, however, the need has become clear. Our researches have disclosed cases sanctioning delays of as long as 40 days and even six

months between seizure of obscene goods and commencement of judicial proceedings. See *United States* v. *77 Cartons of Magazines,* 300 F. Supp. 851 (ND Cal. 1969); *United States* v. *One Carton Positive Motion Picture Film Entitled "491,"* 247 F. Supp. 450 (SDNY 1965), rev'd on other grounds, 367 F. 2d 889 (CA2 1966). Similarly, we have found cases in which completion of judicial proceedings has taken as long as three, four, and even seven months. See *United States* v. *Ten Erotic Paintings,* 311 F. Supp. 884 (Md. 1970); *United States* v. *35 MM Color Motion Picture Film Entitled "Language of Love,"* 311 F. Supp. 108 (SDNY 1970); *United States* v. *One Carton Positive Motion Picture Film Entitled "491," supra.* We conclude that to sanction such delays would be clearly inconsistent with the concern for promptness that was so frequently articulated during the course of the Senate's debates, and that fidelity to Congress' purpose dictates that we read explicit time limits into the section. The only alternative would be to hold § 1305 (a) unconstitutional in its entirety, but Congress has explicitly directed that the section not be invalidated in its entirety merely because its application to some persons be adjudged unlawful. See 19 U. S. C. § 1652. Nor does the construction of § 1305 (a) to include specific time limits require us to decide issues of policy appropriately left to the Congress or raise other questions upon which Congress possesses special legislative expertise, for Congress has already set its course in favor of promptness and we possess as much expertise as Congress in determining the sole remaining question—that of the speed with which prosecutorial and judicial institutions can, as a practical matter, be expected to function in adjudicating § 1305 (a) matters. We accordingly see no reason for declining to specify the time limits which must be incorporated into § 1305 (a)—a specification that is fully consistent with congressional purpose and that will obviate the constitu-

tional objections raised by claimant. Indeed, we conclude that the legislative history of the section and the policy of giving legislation a saving construction in order to avoid decision of constitutional questions require that we undertake this task of statutory construction.

We begin by examining cases in the lower federal courts in which proceedings have been brought under § 1305 (a). That examination indicates that in many of the cases that have come to our attention the Government in fact instituted forfeiture proceedings within 14 days of the date of seizure of the allegedly obscene goods, see *United States* v. *Reliable Sales Co.,* 376 F. 2d 803 (CA4 1967); *United States* v. *1,000 Copies of a Magazine Entitled "Solis,"* 254 F. Supp. 595 (Md. 1966); *United States* v. *56 Cartons Containing 19,500 Copies of a Magazine Entitled "Hellenic Sun,"* 253 F. Supp. 498 (Md. 1966), aff'd, 373 F. 2d 635 (CA4 1967); *United States* v. *392 Copies of a Magazine Entitled "Exclusive,"* 253 F. Supp. 485 (Md. 1966); and judicial proceedings were completed within 60 days of their commencement. See *United States* v. *Reliable Sales Co., supra; United States* v. *1,000 Copies of a Magazine Entitled "Solis," supra; United States* v. *56 Cartons Containing 19,500 Copies of a Magazine Entitled "Hellenic Sun," supra; United States* v. *392 Copies of a Magazine Entitled "Exclusive," supra; United States* v. *127,295 Copies of Magazines, More or Less,* 295 F. Supp. 1186 (Md. 1968). Given this record, it seems clear that no undue hardship will be imposed upon the Government and the lower federal courts by requiring that forfeiture proceedings be commenced within 14 days and completed within 60 days of their commencement; nor does a delay of as much as 74 days seem undue for importers engaged in the lengthy process of bringing goods into this country from abroad. Accordingly, we construe § 1305 (a) to require intervals of no more

than 14 days from seizure of the goods to the institution of judicial proceedings for their forfeiture and no longer than 60 days from the filing of the action to final decision in the district court. No seizure or forfeiture will be invalidated for delay, however, where the claimant is responsible for extending either administrative action or judicial determination beyond the allowable time limits or where administrative or judicial proceedings are postponed pending the consideration of constitutional issues appropriate only for a three-judge court.

Of course, we do not now decide that these are the only constitutionally permissible time limits. We note, furthermore, that constitutionally permissible limits may vary in different contexts; in other contexts, such as a claim by a state censor that a movie is obscene, the Constitution may impose different requirements with respect to the time between the making of the claim and the institution of judicial proceedings or between their commencement and completion than in the context of a claim of obscenity made by customs officials at the border. We decide none of these questions today. We do nothing in this case but construe § 1305 (a) in its present form, fully cognizant that Congress may re-enact it in a new form specifying new time limits, upon whose constitutionality we may then be required to pass.

So construed, § 1305 (a) may constitutionally be applied to the case before us. Seizure in the present case took place on October 24 and forfeiture proceedings were instituted on November 6—a mere 13 days after seizure. Moreover, decision on the obscenity of Luros' materials might well have been forthcoming within 60 days had claimant not challenged the validity of the statute and caused a three-judge court to be convened. We hold that proceedings of such brevity fully meet the constitutional standards set out in *Freedman, Teitel,* and

*Blount.* Section 1305 (a) accordingly may be applied to the 37 photographs, providing that on remand the obscenity issue is resolved in the District Court within 60 days, excluding any delays caused by Luros.

## II

We next consider Luros' second claim, which is based upon *Stanley* v. *Georgia, supra.* On the authority of *Stanley,* Luros urged the trial court to construe the First Amendment as forbidding any restraints on obscenity except where necessary to protect children or where it intruded itself upon the sensitivity or privacy of an unwilling adult. Without rejecting this position, the trial court read *Stanley* as protecting, at the very least, the right to read obscene material in the privacy of one's own home and to receive it for that purpose. It therefore held that § 1305 (a), which bars the importation of obscenity for private use as well as for commercial distribution, is overbroad and hence unconstitutional.[3]

[3] The District Court's opinion is not entirely clear. The court may have reasoned that Luros had a right to import the 37 photographs in question for planned distribution to the general public, but our decision today in *United States* v. *Reidel, ante,* p. 351, makes it clear that such reasoning would have been in error. On the other hand, the District Court may have reasoned that, while Luros had no right to import the photographs for distribution, a person would have a right under *Stanley* to import them for his own private use and that § 1305 (a) was therefore void as overbroad because it prohibits both sorts of importation. If this was the court's reasoning, the proper approach, however, was not to invalidate the section in its entirety, but to construe it narrowly and hold it valid in its application to Luros. This was made clear in *Dombrowski* v. *Pfister,* 380 U. S. 479, 491–492 (1965), where the Court noted that, once the overbreadth of a statute has been sufficiently dealt with, it may be applied to prior conduct foreseeably within its valid sweep.

The trial court erred in reading *Stanley* as immunizing from seizure obscene materials possessed at a port of entry for the purpose of importation for private use. In *United States* v. *Reidel, ante,* p. 351, we have today held that Congress may constitutionally prevent the mails from being used for distributing pornography. In this case, neither Luros nor his putative buyers have rights that are infringed by the exclusion of obscenity from incoming foreign commerce. By the same token, obscene materials may be removed from the channels of commerce when discovered in the luggage of a returning foreign traveler even though intended solely for his private use. That the private user under *Stanley* may not be prosecuted for possession of obscenity in his home does not mean that he is entitled to import it from abroad free from the power of Congress to exclude noxious articles from commerce. *Stanley's* emphasis was on the freedom of thought and mind in the privacy of the home. But a port of entry is not a traveler's home. His right to be let alone neither prevents the search of his luggage nor the seizure of unprotected, but illegal, materials when his possession of them is discovered during such a search. Customs officers characteristically inspect luggage and their power to do so is not questioned in this case; it is an old practice and is intimately associated with excluding illegal articles from the country. Whatever the scope of the right to receive obscenity adumbrated in *Stanley,* that right, as we said in *Reidel,* does not extend to one who is seeking, as was Luros here, to distribute obscene materials to the public, nor does it extend to one seeking to import obscene materials from abroad, whether for private use or public distribution. As we held in *Roth* v. *United States,* 354 U. S. 476 (1957), and reiterated today in *Reidel, supra,* obscenity is not within the scope of First Amendment protection. Hence Congress may

declare it contraband and prohibit its importation, as it has elected in § 1305 (a) to do.

The judgment of the District Court is reversed and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

[For dissenting opinion of MR. JUSTICE MARSHALL, see *ante,* p. 360.]

MR. JUSTICE HARLAN, concurring in the judgment and in Part I of MR. JUSTICE WHITE's opinion.

I agree, for the reasons set forth in Part I of MR. JUSTICE WHITE's opinion, that this statute may and should be construed as requiring administrative and judicial action within specified time limits that will avoid the constitutional issue that would otherwise be presented by *Freedman* v. *Maryland,* 380 U. S. 51 (1965). Our decision today in *United States* v. *Reidel, ante,* p. 351, forecloses Luros' claim that the Government may not prohibit the importation of obscene materials for commercial distribution.

Luros also attacked the statute on its face as overbroad because of its apparent prohibition of importation for private use. A statutory scheme purporting to proscribe only importation for commercial purposes would certainly be sufficiently clear to withstand a facial attack on the statute based on the notion that the line between commercial and private importation is so unclear as to inhibit the alleged right to import for private use. Cf. *Breard* v. *Alexandria,* 341 U. S. 622 (1951). It is incontestable that 19 U. S. C. § 1305 (a) is intended to cover at the very least importation of obscene materials for commercial purposes. See n. 1 of MR. JUSTICE WHITE's opinion. Since the parties stipulated that the materials

were imported for commercial purposes, Luros cannot claim that his primary conduct was not intended to be within the statute's sweep. Cf. *Dombrowski* v. *Pfister,* 380 U. S. 479, 491–492 (1965). Finally, the statute includes a severability clause. 19 U. S. C. § 1652.

Thus it is apparent that we could only narrow the statute's sweep to commercial importation, were we to determine that importation for private use is constitutionally privileged. In these circumstances, the argument that Luros should be allowed to raise the question of constitutional privilege to import for private use, in order to protect the alleged First Amendment rights of private importers of obscenity from the "chilling effects" of the statute's presence on the books, seems to me to be clearly outweighed by the policy that the resolution of constitutional questions should be avoided where not necessary to the decision of the case at hand.

I would hold that Luros lacked standing to raise the overbreadth claim. See Note, The First Amendment Overbreadth Doctrine, 83 Harv. L. Rev. 844, 910 (1970).

On the foregoing premises I join Part I of the Court's opinion and as to Part II, concur in the judgment.*

MR. JUSTICE STEWART, concurring in the judgment and in Part I of MR. JUSTICE WHITE's opinion.

I agree that the First Amendment does not prevent the border seizure of obscene materials sought to be imported for commercial dissemination. For the reasons expressed in Part I of MR. JUSTICE WHITE's opinion, I also agree that *Freedman* v. *Maryland,* 380 U. S. 51, requires that there be time limits for the initiation of forfeiture proceedings and for the completion of the judicial determination of obscenity.

---

*Again, as in *United States* v. *Reidel, supra,* the obscenity *vel non* of the seized materials is not presented at this juncture of the case.

But I would not in this case decide, even by way of dicta, that the Government may lawfully seize literary material intended for the purely private use of the importer.[1] The terms of the statute appear to apply to an American tourist who, after exercising his constitutionally protected liberty to travel abroad,[2] returns home with a single book in his luggage, with no intention of selling it or otherwise using it, except to read it. If the Government can constitutionally take the book away from him as he passes through customs, then I do not understand the meaning of *Stanley* v. *Georgia*, 394 U. S. 557.

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins, dissenting.*

## I

I dissent from the judgments of the Court for the reasons stated in many of my prior opinions. See, *e. g.,* *Smith* v. *California*, 361 U. S. 147, 155 (1959) (BLACK, J., concurring); *Ginzburg* v. *United States*, 383 U. S. 463, 476 (1966) (BLACK, J., dissenting). In my view the First Amendment denies Congress the power to act as censor and determine what books our citizens may read and what pictures they may watch.

I particularly regret to see the Court revive the doctrine of *Roth* v. *United States*, 354 U. S. 476 (1957), that "obscenity" is speech for some reason unprotected by the First Amendment. As the Court's many decisions

---

[1] As MR. JUSTICE WHITE's opinion correctly says, even if seizure of material for private use is unconstitutional, the statute can still stand in appropriately narrowed form, and the seizure in this case clearly falls within the valid sweep of such a narrowed statute. *Ante,* at 375, n. 3.

[2] *Aptheker* v. *Secretary of State*, 378 U. S. 500.

*[This opinion applies also to No. 534, *United States* v. *Reidel, ante,* p. 351.]

in this area demonstrate, it is extremely difficult for judges or any other citizens to agree on what is "obscene." Since the distinctions between protected speech and "obscenity" are so elusive and obscure, almost every "obscenity" case involves difficult constitutional issues. After *Roth* our docket and those of other courts have constantly been crowded with cases where judges are called upon to decide whether a particular book, magazine, or movie may be banned. I have expressed before my view that I can imagine no task for which this Court of lifetime judges is less equipped to deal. *Smith* v. *California, supra,* (BLACK, J., concurring).

In view of the difficulties with the *Roth* approach, it is not surprising that many recent decisions have at least implicitly suggested that it should be abandoned. See *Stanley* v. *Georgia,* 394 U. S. 557 (1969); *Redrup* v. *New York,* 386 U. S. 767 (1967). Despite the proved shortcomings of *Roth,* the majority in *Reidel* today reaffirms the validity of that dubious decision. Thus, for the foreseeable future this Court must sit as a Board of Supreme Censors, sifting through books and magazines and watching movies because some official fears they deal too explicitly with sex. I can imagine no more distasteful, useless, and time-consuming task for the members of this Court than perusing this material to determine whether it has "redeeming social value." This absurd spectacle could be avoided if we would adhere to the literal command of the First Amendment that "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ."

## II

Wholly aside from my own views of what the First Amendment demands, I do not see how the reasoning of MR. JUSTICE WHITE's opinion today in *Thirty-Seven Photographs* can be reconciled with the holdings of

earlier cases. That opinion insists that the trial court erred in reading *Stanley* v. *Georgia, supra,* "as immunizing from seizure obscene materials possessed at a port of entry for the purpose of importation for private use." *Ante,* at 376. But it is never satisfactorily explained just why the trial court's reading of *Stanley* was erroneous. It would seem to me that if a citizen had a right to possess "obscene" material in the privacy of his home he should have the right to receive it voluntarily through the mail. Certainly when a man legally purchases such material abroad he should be able to bring it with him through customs to read later in his home. The mere act of importation for private use can hardly be more offensive to others than is private perusal in one's home. The right to read and view any literature and pictures at home is hollow indeed if it does not include a right to carry that material privately in one's luggage when entering the country.

The plurality opinion seems to suggest that *Thirty-Seven Photographs* differs from *Stanley* because "Customs officers characteristically inspect luggage and their power to do so is not questioned in this case . . . ." *Ante,* at 376. But surely this observation does not distinguish *Stanley,* because police frequently search private homes as well, and their power to do so is unquestioned so long as the search is reasonable within the meaning of the Fourth Amendment.

Perhaps, however, the plurality reasons silently that a prohibition against importation of obscene materials for private use is constitutionally permissible because it is necessary to prevent ultimate commercial distribution of obscenity. It may feel that an importer's intent to distribute obscene materials commercially is so difficult to prove that all such importation may be outlawed without offending the First Amendment. A very similar argument was made by the State in *Stanley* when it urged

that enforcement of a possession law was necessary because of the difficulties of proving intent to distribute or actual distribution. However, the Court unequivocally rejected that argument because an individual's right to "read or observe what he pleases" is so "fundamental to our scheme of individual liberty." 394 U. S., at 568.

Furthermore, any argument that all importation may be banned to stop possible commercial distribution simply ignores numerous holdings of this Court that legislation touching on First Amendment freedoms must be precisely and narrowly drawn to avoid stifling the expression the Amendment was designed to protect. Certainly the Court has repeatedly applied the rule against overbreadth in past censorship cases, as in *Butler* v. *Michigan*, 352 U. S. 380 (1957), where we held that the State could not quarantine "the general reading public against books not too rugged for grown men and women in order to shield juvenile innocence." *Id.*, at 383. Cf. *Thornhill* v. *Alabama*, 310 U. S. 88 (1940); *United States* v. *Robel*, 389 U. S. 258 (1967).

Since the plurality opinion offers no plausible reason to distinguish private possession of "obscenity" from importation for private use, I can only conclude that at least four members of the Court would overrule *Stanley*. Or perhaps in the future that case will be recognized as good law only when a man writes salacious books in his attic, prints them in his basement, and reads them in his living room.

The plurality opinion appears to concede that the customs obscenity statute is unconstitutional on its face after the Court's decision in *Freedman* v. *Maryland*, 380 U. S. 51 (1965), because this law specifies no time limits within which forfeiture proceedings must be started against seized books or pictures, and it does not require a prompt final judicial hearing on obscenity. *Ante*, at 368–369. Once the plurality has reached this determination, the proper course would be to affirm the lower court's de-

cision. But the plurality goes on to rewrite the statute by adding specific time limits. The plurality then notes that the Government here has conveniently stayed within these judicially manufactured limits by one day, and on that premise it concludes the statute may be enforced in this case. In my view the plurality's action in rewriting this statute represents a seizure of legislative power that we simply do not possess under the Constitution.

Certainly claimant Luros has standing to raise the claim that the customs statute's failure to provide for prompt judicial decision renders it unconstitutional. Our previous decisions make clear that such censorship statutes may be challenged on their face as a violation of First Amendment rights "whether or not [a defendant's] conduct could be proscribed by a properly drawn statute." *Freedman* v. *Maryland, supra,* at 56. This is true because of the "danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." *NAACP* v. *Button,* 371 U. S. 415, 433 (1963). Since this censorship statute is unconstitutional on its face, and claimant has standing to challenge it as such, that should end the case without further ado. But the plurality nimbly avoids this result by writing a new censorship statute.

I simply cannot understand how the plurality determines it has the power to substitute the new statute for the one that the duly elected representatives of the people have enacted. The plurality betrays its uneasiness when it concedes that we specifically refused to undertake any such legislative task in *Freedman, supra,* and in *Blount* v. *Rizzi,* 400 U. S. 410 (1971). After holding the Maryland movie censorship law unconstitutional in *Freedman,* the Court stated:

> "How or whether Maryland is to incorporate the required procedural safeguards in the statutory

scheme is, of course, for the State to decide." 380 U. S., at 60.

With all deference, I would suggest that the decision whether and how the customs obscenity law should be rewritten is a task for the Congress, not this Court. Congress might decide to write an entirely different law, or even decide that the Nation can well live without such a statute.

The plurality claims to find power to rewrite the customs obscenity law in the statute's legislative history and in the rule that statutes should be construed to avoid constitutional questions. *Ante,* at 373. I agree, of course, that statutes should be construed to uphold their constitutionality when this can be done without misusing the legislative history and substituting a new statute for the one that Congress has passed. But this rule of construction does not justify the plurality's acting like a legislature or one of its committees and redrafting the statute in a manner not supported by the deliberations of Congress or by our previous decisions in censorship cases.

The plurality relies principally on statements made by Senators Swanson and Pittman when the customs obscenity legislation was under discussion on the Senate floor. The defect in the Court's reliance is that the Senators' statements did not refer to the version of the law that was passed by Congress. Senator Pittman, objecting to one of the very first drafts of the law, said:

> "Why would it not protect the public entirely if we were to provide for the seizure as now provided and that the property should be held by the officer seizing, and that he should immediately report to the nearest United States district attorney having authority under the law to proceed to confiscate . . . ."
> 72 Cong. Rec. 5240.

A few minutes later Senator Walsh of Montana announced he would propose an amendment "that would meet the suggestion made by the Senator from Nevada [Mr. Pittman] . . . ." *Id.*, at 5421. As Senator Walsh first presented his amendment it read:

> "Upon the appearance of any such book or other matter at any customs office the collector thereof shall *immediately* transmit information thereof to the district attorney of the district in which such port is situated, who shall *immediately* institute proceedings in the district court for the forfeiture and destruction of the same . . . ." *Ibid.* (Emphasis added.)

Senator Swanson was referring to this *first draft* of the Walsh amendment when he made the remarks cited by the plurality that officers would be required to go to court "immediately" and that there would be a "prompt" decision on the matter. *Id.*, at 5422, 5424. But just after Swanson's statement the Walsh amendment was changed on the Senate floor to read as follows:

> "Upon the seizure of such book or matter the *collector shall transmit* information thereof to the district attorney of the district in which is situated the office at which such seizure has taken place, *who shall institute* proceedings in the district court for the forfeiture, confiscation, and destruction of the book or matter seized." *Id.*, at 5424. (Emphasis added.)

Thus the requirement that officers go to court "immediately" was dropped in the second draft of the Walsh amendment, and the language of this second draft was enacted into law. The comments quoted and relied upon by the plurality were made with reference to an amendment draft that was not adopted by the Senate and is not now the law. This legislative history just referred

to provides no support that I can see for the Court's action today. To the extent that these debates tell us anything about the Senate's attitude toward prompt judicial review of censorship decisions they show simply that the issue was put before the Senate but that it did not choose to require prompt judicial review.

The plurality concedes that in previous censorship cases we have considered the validity of the statutes before us on their face, and we have refused to rewrite them. Although some of these cases did involve state statutes, in *Blount* v. *Rizzi*, 400 U. S. 410 (1971), we specifically declined to attempt to save a federal obscenity mail-blocking statute by redrafting it. The Court there plainly declared: "it is for Congress, not this Court, to rewrite the statute." *Id.,* at 419. The plurality in its opinion now seeks to distinguish *Blount* because saving the mail-blocking statute by requiring prompt judicial review "would have required its complete rewriting in a manner inconsistent with the expressed intentions of some of its authors." *Ante,* at 369. But the only "expressed intention" cited by the plurality to support this argument is testimony by the Postmaster General that he wanted to forestall judicial review pending completion of administrative mail-blocking proceedings. *Ante,* at 370. That insignificant piece of legislative history would have posed no obstacle to the Court's saving the mail-blocking statute by requiring prompt judicial review *after* prompt administrative proceedings. Yet the Court in *Blount* properly refused to undertake such a legislative task, just as it did in the cases involving state censorship statutes.

The plurality also purports to justify its judicial legislation by pointing to the severability provisions contained in 19 U. S. C. § 1652. It is difficult to see how this distinguishes earlier cases, since the statutes struck down in *Freedman* v. *Maryland, supra,* and *Teitel Film Corp.* v. *Cusack,* 390 U. S. 139 (1968), also contained

severability provisions. See Md. Ann. Code, Art. 66A, § 24 (1957), Municipal Code of Chicago § 155–7.4 (1961).

The plurality is not entirely clear whether the time limits it imposes stem from the legislative history of the customs law or from the demands of the First Amendment. At one point we are told that 14 days and 60 days are not the "only constitutionally permissible time limits," and that if Congress imposes new rules this would present a new constitutional question. *Ante,* at 374. This strongly suggests the time limits stem from the Court's power to "interpret" or "construe" federal statutes, not from the Constitution. But since the Court's action today has no support in the legislative history or the wording of the statute, it appears much more likely that the time limits are derived from the First Amendment itself. If the plurality is really drawing its rules from the First Amendment, I find the process of derivation both peculiar and disturbing. The rules are not derived by considering what the First Amendment demands, but by surveying previously litigated cases and then guessing what limits would not pose an "undue hardship" on the Government and the lower federal courts. *Ante,* at 373. Scant attention is given to the First Amendment rights of persons entering the country. Certainly it gives little comfort to an American bringing a book home to Colorado or Alabama for personal reading to be informed without explanation that a 74-day delay at New York harbor is not "undue." Faced with such lengthy legal proceedings and the need to hire a lawyer far from home, he is likely to be coerced into giving up his First Amendment rights. Thus the whims of customs clerks or the congestion of their business will determine what Americans may read.

I would simply leave this statute as the Congress wrote it and affirm the judgment of the District Court.

I do not understand why the plurality feels so free to abandon previous precedents protecting the cherished freedoms of press and speech. I cannot, of course, believe it is bowing to popular passions and what it perceives to be the temper of the times. As I have said before, "Our Constitution was not written in the sands to be washed away by each wave of new judges blown in by each successive political wind that brings new political administrations into temporary power." *Turner* v. *United States,* 396 U. S. 398, 426 (1970) (BLACK, J., dissenting). In any society there come times when the public is seized with fear and the importance of basic freedoms is easily forgotten. I hope, however, "that in calmer times, when present pressures, passions and fears subside, this or some later Court will restore the First Amendment liberties to the high preferred place where they belong in a free society." *Dennis* v. *United States,* 341 U. S. 494, 581 (1951) (BLACK, J., dissenting).