Siamack ZAIMI, Appellant,

v.

UNITED STATES, Appellee.

No. 23933.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 13, 1971.

Decided Feb. 7, 1973.

**512**

Robert C. Maynard, Washington, D. C., with whom Ralph J. Temple, Washington, D. C., was on the brief, for appellant.

Warren R. King, Asst. U. S. Atty., with whom Thomas A. Flannery, U. S. Atty., at the time the brief was filed, John A. Terry and Henry F. Greene, Asst. U. S. Attys., were on the brief, for appellee.

Before WRIGHT, ROBINSON and WILKEY, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This appeal is from affirmance by the District of Columbia Court of Appeals[1] of a judgment of the District of Columbia Court of General Sessions[2] convicting appellant, Siamack Zaimi, of "bring[ing]" the Shah of Iran "into public disrepute"[3] in purported violation of D.C.Code § 22–1115.[4] Zaimi contends that that section imposes an unconstitutional restraint on freedom of speech and that the evidence at his trial was insufficient to warrant conviction.[5]

We conclude that the activities upon which Zaimi's conviction rested did not

---

1. Zaimi v. United States, 261 A.2d 233 (D.C.App.1970).

2. Now the Superior Court of the District of Columbia. D.C.Code § 11–901 (Supp. V 1972).

3. See text *infra* at note 19.

4. "It shall be unlawful to display any flag, banner, placard, or device designed or adapted to intimidate, coerce, or bring into public odium any foreign government, party, or organization, or any officer or officers thereof, or to bring into public disrepute, political, social, or economic acts, views, or purposes of any foreign government, party, or organization, or to intimidate, coerce, harass, or bring into public disrepute any officer or officers or diplomatic or consular representatives of any foreign government, or to interfere with the free and safe pursuit of the duties of

any diplomatic or consular representatives of any foreign government, within five hundred feet of any building or premises within the District of Columbia used or occupied by any foreign government or its representative or representatives as an embassy, legation, consulate, or for other official purposes, except by, and in accordance with, a permit issued by the superintendent of police of the said District; or to congregate within five hundred feet of any such building or premises, and refuse to disperse after having been ordered so to do by the police authorities of the said District." D.C.Code § 22–1115 (1967).

5. A related contention is that so much of the information upon which Zaimi was tried as undertook to charge the offense for which he was convicted did not allege a violation of § 22–1115.

infringe Section 22–1115. Accordingly, and without reaching Zaimi's constitutional arguments, we reverse.

I

On June 12, 1968, while the Shah of Iran was in temporary residence at Blair House during an official visit to the United States, Zaimi and a companion, Khosro Kalantari,[6] became principals in two incidents on the sidewalk across the street from Blair House.[7] The first occurred about 12:30 p. m. when, as the Shah was getting into a car en route to the White House, Zaimi and Kalantari stepped off the curb and "shouted" in a foreign language.[8] The second episode took place about 2:10 p. m. while the Shah was inside Blair House. Zaimi and his companion were again observed on the sidewalk, and Zaimi was carrying "something wrapped" under his arm. Police officers approached, inquired as to what it was, and were told that it was a banner which Zaimi intended to unfurl when the Shah came out of Blair House.[9] The officers seized the banner, informing them it would be unlawful to display it within five hundred feet of Blair House while the Shah was staying there.[10] Then followed the events which precipitated their arrests.

Failing in efforts to persuade the officers to return the banner, Kalantari, and then Zaimi, mounted a curbing beside the sidewalk and each began "shouting," partly in English and partly in a foreign tongue. As described at trial, Kalantari declared "that the Shah was selling out to American capitalists" and Zaimi "said approximately the same thing."[11] The speeches lasted about five minutes; about thirty people were standing nearby and "[t]hey just watched what was going on." It appears without controversy that Zaimi and Kalantari were then within five hundred feet[12] of Blair House, and that neither had a permit to engage in speechmaking at that point.[13] Officers advised the pair that they were violating the law[14] and, when they refused to desist, placed them under arrest.[15]

Zaimi and Kalantari were jointly prosecuted on an information laying two charges under Section 22–1115. The

---

6. Zaimi and Kalantari are Iranian nationals then studying in the United States. Kalantari is not a party to this appeal.

7. Some few facts are in dispute, but none of the disputes affects our disposition in the least.

8. The record contains no translation or indication whatever as to what was said. It suggests, rather, that police officers nearby did not understand the message.

9. The banner was a piece of canvas, two feet by eight and one-half feet, upon which the words "Shah, Puppet of United States Imperialism" were printed in lettering ranging from three and one-half to six inches in height. Uncontradicted evidence at Zaimi's trial establishes that the banner was never unfolded by Zaimi or Kalantari and that, of course, it could not be read while folded. As Government counsel conceded at trial, neither Zaimi nor Kalantari was charged with displaying the banner. See text *infra* at notes 16–17.

10. The reference ostensibly was to § 22–1115. See note 4, *supra*.

11. At trial, Zaimi testified that he talked about the situation in Iran and the 600 million dollars [the Shah] came to borrow. . . . [I] said, well, that the arms that [the Shah] bought were going to be used to suppress the people of Iran, as he has done several times before. And I also asserted that it was his purpose also that the United States back up the Shah of Iran and pick up the burden of Iran in order to suppress the Iranian people.

12. See note 4, *supra*.

13. See note 4, *supra*.

14. Officer Carl W. Mattis, the Government's sole witness, testified that Zaimi and Kalantari were told "[t]hat they were in violation of the law—that they would have to discontinue the shouting and move on." See note 15, *infra*.

15. Officer Mattis testified that, at the time of the arrests, he stated to Zaimi "[t]hat they had been placed under arrest and charged with disorderly conduct." No such charge eventuated, however, in the information upon which Zaimi was tried. See text *infra* at notes 16–17.

first was that they "did . . . [i]ntimidate, coerce, harass and bring into public disrepute an officer of a foreign government . . . within five hundred feet of a building . . . being used and occupied by the representative of a foreign government . . . for an official purpose without a permit from the Chief of Police . . . ."[16] The second charge was that they "did congregate within five hundred feet of such building . . . and refuse to disperse after having been ordered so to do by the police authorities. . . ."[17] At the conclusion of trial, without a jury, the District of Columbia Court of General Sessions granted a defense motion to dismiss the second charge,[18] but found both guilty on the charge, in the court's words, "that they did bring into public disrepute an officer of a foreign government, the Shah of Iran. . . ."[19] Each was sentenced to pay a fine of $100 or spend five days in jail.[20] The District of Columbia Court of Appeals rejecting Zaimi's constitutional and insufficiency-of-evidence claims, affirmed[21] and the case is here for our review.[22]

## II

For convenience of analysis, we reproduce Section 22–1115 in toto. It provides:

It shall be unlawful to display any flag, banner, placard, or device designed or adapted to intimidate, coerce, or bring into public odium any foreign government, party, or organization, or any officer or officers thereof, or to bring into public disrepute political, social, or economic acts, views, or purposes of any foreign government, party, or organization, or to intimidate, coerce, harass, or bring into public disrepute any officer or officers or diplomatic or consular representatives of any foreign government, or to interfere with the free and safe pursuit of the duties of any diplomatic or consular representatives of any foreign government, within five hundred feet of any building or premises within the District of Columbia used or occupied by any foreign government or its representative or representatives as an embassy, legation, consulate, or for other official purposes, except by, and in accordance with, a permit issued by the superintendent of police of the said District; or to congregate within five hundred feet of any such building or premises, and refuse to disperse after having been ordered so to do by the police authorities of the said District.[23]

This was the statute upon which Zaimi was charged, tried and convicted, and the first effort it beckons is one to ascertain just what species of conduct its multifarious provisions restrict. As even the most careful examination of this section discloses, the reach of some of its prohibitions is far from certain.

In two of its several aspects, the meaning of Section 22–1115 rings clearly. One is the portion following the only semicolon—the fifth prohibition, making it unlawful "to congregate within five hundred feet of any such building or premises, and refuse to disperse after having been ordered so to do by

16. See note 125, *infra.*

17. See note 18, *infra.*

18. The dismissal was apparently predicated upon the court's view that two people cannot "congregate" within the meaning of § 22–1115. See Kinoy v. District of Columbia, 130 U.S.App.D.C. 290, 298, 400 F.2d 761, 769 (1968); Hunter v. District of Columbia, 47 App.D.C. 406, 409 (1918). We intimate no view on that aspect of the case.

19. See note 4, *supra.*

20. But see Tate v. Short, 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971). Our disposition of Zaimi's conviction renders unnecessary any consideration of the validity of the sentence.

21. Zaimi v. United States, *supra* note 1.

22. Pursuant to D.C.Code § 11–301 (1967). See District of Columbia Court Reorganization Act of 1970, Pub.L. No. 91–358, tit, I, §§ 146(a)(1), 199(b)(4), 84 Stat. 473, 565, 598 (1970).

23. D.C.Code § 22–1115 (1967).

the police authorities of the said District." [24] It is apparent merely from a reading that this interdiction is functionally as well as grammatically separate from those preceding it. The other aspect in which the statutory language presents no difficulty is the first prohibition, making it unlawful "to display any flag, banner, placard, or device designed or adapted to intimidate, coerce, or bring into public odium any foreign government, party, or organization, or any officer or officers thereof." [25] It is evident, as the parties recognize, that there can be no violation of this injunction without a "display" of a "flag, banner, placard, or device" which is "designed or adapted" to produce one or more of the enumerated consequences.

The remaining provisions of Section 22–1115, however, are not nearly so distinct. The second prohibition relates to conduct intended "to bring into public disrepute political, social, or economic acts, views, or purposes of any foreign government, party or organization." [26] The third prohibition refers to activity calculated "to intimidate, coerce, harass, or bring into public disrepute any officer or officers or diplomatic or consular representatives of any foreign government." [27] The fourth prohibition is aimed at behavior undertaking "to interfere with the free and safe pursuit of the duties of any diplomatic or consular representatives of any foreign government." [28] The question, however, is whether Section 22–1115 means that "[i]t shall be unlawful [simply] to" achieve a result specified in these three provisions, or whether it means that

"[i]t shall be unlawful to display any flag, banner, placard, or device designed or adapted to" achieve the prohibited result.[29]

Thus we are confronted by the problem whether the second, third and fourth prohibitions of Section 22–1115 intercept conduct which does not involve the "display" of a "flag, banner, placard, or device designed or adapted" to bring about one or more of the effects condemned.[30] Stated differently, the problem is whether an offense under Section 22–1115 is committed simply by utterances unaccompanied by a "congregat[ing]" or a "display" of a "flag, banner, placard, or other device" which is "designed or adapted" to accomplish an end which the section undertakes to forbid.[31] If not, it follows that Zaimi did not trespass upon the statute for, as the trial judge found, there was no "congregat[ing]" [32] and, as the uncontradicted evidence demonstrated, the banner which Zaimi at one time carried was never "display[ed]." [33]

We have not previously had occasion to examine the scope of Section 22–1115 in this regard. In Frend v. United States,[34] this court was summoned primarily to resolve a First Amendment challenge by four defendants in a situation where an infraction was beyond peradventure. As the opinion in that case states, "[t]he evidence abundantly shows that all four defendants flagrantly violated the terms of the" statute,[35] for "[a]t the time of the arrest, each defendant was parading in the public streets in front of the Austrian or the German embassy with a number of other

---

24. See text *supra* at note 23.

25. See text *supra* at note 23.

26. See text *supra* at note 23.

27. See text *supra* at note 23.

28. See text *supra* at note 23.

29. See text *supra* at note 23.

30. See text *supra* at note 23.

31. See text *supra* at note 23.

32. See note 18, *supra*, and accompanying text.

33. See note 9, *supra*, and accompanying text. There was nothing in the evidence at Zaimi's trial suggesting that he possessed any "flag, banner, placard, or device" other than the banner which the police officers took from him before it was displayed.

34. 69 App.D.C. 281, 100 F.2d 691 (1938), cert. denied, 306 U.S. 640, 59 S.Ct. 488, 83 L.Ed. 1040 (1939).

35. *Id.* at 282, 100 F.2d at 692.

persons, some of whom were carrying banners or placards inscribed with language . . . intended and calculated to bring into contempt the German Government." [36] Since "this congregation of people with opprobrious signs and songs in the streets in front of the embassies was a concerted, prearranged plan intended 'to bring into public disrepute political, social, or economic . . . views · . . . of [a] foreign government,'" the conclusion was that "[i]n the circumstances, and without stopping to determine whether each of the defendants was then displaying one of the placards mentioned, we think that all are guilty under the provisions of the local law making it an offense to aid and abet in a violation of a law." [37] Neither in *Frend* nor in any other case have we been called upon to determine whether Section 22–1115 tolerates a conviction where the allegedly offensive conduct consisted wholly in spoken words.[38]

The parties did not deal with this problem in their briefs or oral arguments. When, after submission of the case, it became apparent to us that it lay at the threshold, we invited supplemental memoranda addressed to it. The parties responded, each arguing that Section 22–1115 covers speech as well as demonstrative acts. We have carefully considered these presentations, and have ourselves investigated the matter independently. We detail herein the fruits of our study.

Our starting point is the language of Section 22–1115,[39] and it is obvious that it is readily susceptible to either of two possible constructions. By one— which the parties advocate—the statute would limit the need for "display" of a "flag, banner, placard, or device" to the first prohibition.[40] If this is what the statute means, the second, third and fourth prohibitions could be violated by utterances without more. On the other hand, Section 22–1115 may with equal facility be construed as extending the need for "display" of a "flag, banner, placard or device" to each of its prohibitions except the fifth, forbidding

---

36. *Id.*

37. *Id.*

38. In *Frend*, the court did encounter the contention that § 22–1115 confers an unbridled discretion as to the issuance of permits mentioned. *Id.* at 283, 284, 100 F.2d at 693, 694. The provision relating to the granting of permits was interpreted as an authorization to do so only in cases where use of the permit would not violate the statute. *Id.* at 284, 100 F.2d at 694. Thus construed, we rejected the claim of invalid delegation of authority to issue permits. *Id.*

39. See text *supra* at note 23. Compare United States v. Bass, 404 U.S. 336, 339, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971).

40. So interpreted, Section 22–1115 would read :
It shall be unlawful
[1] to display any flag, banner, placard, or device designed or adapted
[a] to intimidate, coerce, or bring into public odium any
[i] foreign government,
[ii] party, or
[iii] organization, or
[iv] any officer or officers thereof, *or*

[2] to bring into public disrepute
[a] political, social, or economic acts, views, or purposes of any
[i] foreign government,
[ii] party, or
[iii] organization *or*
[3] to intimidate, coerce, harass, or bring into public disrepute
[a] any officer or officers or diplomatic or consular representatives of any foreign government, *or*
[4] to interfere with the free and safe pursuit of the duties of
[a] any diplomatic or consular representatives of any foreign government, within five hundred feet of any building or premises within the District of Columbia used or occupied by any foreign government or its representative or representatives as an embassy, legation, consulate, or for other official purposes, except by, and in accordance with, a permit issued by the superintendent of police of the said District; *or*
[5] to congregate within five hundred feet of any such building or premises, and refuse to disperse after having been ordered so to do by the police authorities of the said District.

"congregat[ing]." [41] By this interpretation, utterances alone would not bring the person making them within the purview of the statute. Rather, Section 22–1115 would proscribe only two acts: (a) the "display," without a permit and within five hundred feet of premises used by representatives of a foreign government of a "flag, banner, placard, or device designed or adapted" to bring about results made taboo by the first four prohibitions; and (b) the "congregat[ing]," within the five hundred foot area, of persons who refuse to disperse upon request of the police, whether or not there is such a display.

### III·

Lacking a decisive indication in the statutory text as to the choice properly to be made between these two constructional alternatives, we turn to the legislative history for such assistance as it may afford.[42] Section 22–1115 had its genesis in a joint resolution introduced by Senator Pittman, Chairman of the Senate Committee on Foreign Relations.[43] As offered, the resolution, to the extent pertinent to the question here, contained two discrete provisions. One,

which was to forerun Section 22–1115, specified

That it shall be unlawful to display any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement, or the political, social, or economic views or purposes of any individual or group, upon any portion of any public highway, street, or alley, including the sidewalks and parkways on both sides thereof, within the District of Columbia adjacent to or within five hundred feet of any building or premises used or occupied by any foreign government or its representatives as an embassy or for diplomatic or other official purposes, except by, and in accordance with, a permit issued by the superintendent of police of the said District; or to congregate upon any such portion of any highway, street, alley, sidewalk, or parkway, and refuse to disperse after having been ordered so to do by the police authorities of the said District.[44]

The other, directed toward loitering on public thoroughfares in the vicinity of such premises, specified that

It shall be unlawful for any person or persons, singly or in groups, to loiter

41. By this construction, Section 22–1115 would read:
It shall be unlawful
[1] to display any flag, banner, placard, or device designed or adapted
[a] to intimidate, coerce, or bring into public odium any
[i] foreign government,
[ii] party,
[iii] or organization,
[iv] or any officer or officers thereof, *or*
[b] to bring into public disrepute
[i] political [acts, views, or purposes],
[ii] social [acts, views, or purposes], or
[iii] economic acts, views, or purposes of any
[i] foreign government,
[ii] party, or
[iii] organization, *or*
[c] to intimidate, coerce, harass, or bring into public disrepute any
[i] officer or officers or
[ii] diplomatic or consular representatives of any foreign government, *or*

[d] to interfere with the free and safe pursuit of the duties of any diplomatic or consular representatives of any foreign government,
within five hundred feet of any building or premises within the District of Columbia used or occupied by any foreign government or its representative or representatives as an embassy, legation, consulate, or for other official purposes, except by, and in accordance with, a permit issued by the superintendent of police of the said District; *or*
[2] to congregate within five hundred feet of any such building or premises, and refuse to disperse after having been ordered so to do by the police authorities of the said District.

42. *E. g.*, Miller v. Udall, 115 U.S.App.D.C. 162, 165, 317 F.2d 573, 576 (1963).

43. 81 Cong.Rec. 7962 (1937).

44. S.J.Res.No.191, 75th Cong., 1st Sess. (1937).

upon any portion of any public highway, street, alley, sidewalk, or any parkway along the same, within the District of Columbia adjacent to any premises used or occupied by any foreign government or its representatives as an embassy or for diplomatic or other official purposes.[45]

Senator Pittman's resolution was referred to the Senate Committee on Foreign Relations,[46] which promptly reported a measure to the Senate. The Committee's version was quite similar to the first provision of the Pittman proposal:

[I]t shall be unlawful to display any flag, banner, or device or design adapted to bring into public notice any party, organization, or movement, or the political, social, or economic acts, views, or purposes of any individual, party, group, or organization within 500 feet of any building or premises within the District of Columbia used or occupied by any foreign government or its representatives as an embassy or for diplomatic or other official purposes, except by and in accordance with the permit issued by the superintendent of police of the said District; or to congregate within 500 feet of any such building or premises and refuse to disperse after having notice so to do by the police authorities of the said District.[47]

The Committee, however, dropped the Pittman provision dealing with loitering.

Plainly, the resolution offered by Senator Pittman undertook proscription only of picketing, congregating and loitering near diplomatic sanctuaries. The first provision would have made unlawful only some "display" of a "flag, banner, or device designed or adapted to bring" certain things "into public notice," when the "display" occurred in close proximity to premises used by foreign governments or their representatives and without a permit authorizing that action;[48] or some "congregat[ing]" on public thoroughfares in the vicinity of such premises, coupled with a refusal to disperse after being ordered to do so by police.[49] The same must be said for the resolution reported out by the Senate Committee on Foreign Relations.[50] Neither version would have condemned any conduct unassociated with some form of "congregat[ing]" or some "display" of a "flag, banner, or device" having a particularized design or adaptation. And although Senator Pittman's offering would also have imposed a ban upon loitering, the Committee omitted it.

When the resolution came up for debate in the Senate, Senator Pittman declared that its first proscription "merely prohibits a display of flags or banners within 500 feet of an embassy or legation or consulate when the flags or banners or devices are intended to bring into public notice an organization or party or group."[51] The motivation for the resolution, he explained, was the need to protect diplomatic sanctuaries in the United States in order to secure pro-

---

45. *Id.*

46. 81 Cong.Rec. 7962 (1937).

47. S.Rep. No. 1072, 75th Cong., 1st Sess. 1 (1937).

48. See text *supra* at note 44.

49. See text *supra* at note 44.

50. See text *supra* at note 47.

51. 81 Cong.Rec. 8484 (1937). The Senator further explained:

It will be observed that such parties or groups may go within 500 feet of an embassy with any banner or flag or device they wish, provided they have the permission of the chief of police. The

reason for that is obvious. There might be a perfectly peaceful parade down the street past an embassy, having nothing to do whatever with the embassy or the ambassador or the country which he represents. On the other hand, the very purpose of the parade might be to criticize the ruler of some government or its ambassador or minister, in which case I personally believe it should not be permitted.

As to congregating near an embassy, there is no punishment provided except and unless the parties refuse to disperse when so ordered.

81 Cong.Rec. 8484 (1937).

tection of American citizens abroad, particularly those seeking shelter within our own sanctuaries in countries experiencing internal conflict.[52] Queried by Senator La Follette as to whether "anything has happened in the City of Washington which . . . threatened or endangered the life of any of the representatives of other governments,"[53] Senator Pittman read a statement of a police inspector describing the picketing of four embassies,[54] and a letter from then Secretary of State Hull urging adoption of the resolution.[55]

The bill reported by the Committee on Foreign Relations, however, was not to engage the attention of the Senate for very long, for Senators Pittman and La Follette each offered amendments as complete substitutes for the Committee's version.[56] It was the Pittman amendment, with but a single modification,[57] which was to emerge as the present Section 22–1115. The La Follette amendment, on the other hand, adopted an entirely different approach. It would have amended an existing statute [58] prohibiting disorderly conduct and assemblages,[59] and unquestionably would have forbidden some types of vocal communication as well as some displays of banners and placards.[60]

Despite the textual differences in the Pittman amendment, neither upon its introduction nor at any point during the lengthy debate that followed did Senator Pittman unequivocally indicate a desire to expand the restriction on communication beyond displays of the type which the Committee's resolution would have outlawed. The Senator emphasized his purpose to protect the safety of occupants of diplomatic sanctuaries from demonstrations likely to erupt in mob violence,[61] and referred repeatedly to dis-

52. *Id.* at 8484, 8485.

53. *Id.* at 8485.

54. *Id.* at 8486. The inspector's statement concentrated almost exclusively on picketing, frequently by large numbers of people, with accompanying banners and signs. Aside from one instance of chanting, it made no mention of vocal communications.

55. *Id.*

56. *Id.* at 8518–8519.

57. See note 78, *infra.*

58. Present D.C.Code § 22–1107 (1967).

59. Senator La Follette's substitute originally proposed to amend D.C.Code § 22–1107 (1967) in the respects denoted by the italicized language:
 Unlawful assembly; profanity, etc., in public places, etc.—It shall not be lawful for any person or persons within the District of Columbia to congregate and assemble in any street, avenue, alley, road, or highway, or in or around any public building or enclosure (*including any building or . premises used or occupied by any foreign government or its representatives as an embassy or for diplomatic or other official purposes*), or any park or reservation, or at the entrance of any private building or enclosure, and engage in loud and boisterous talking or other disorderly conduct, or to insult (*by use of banners, placards, or otherwise*) or to make rude or obscene gestures or comments or observations on persons passing by, or in their hearing, or to crowd, obstruct, or incommode the free use of any such street, avenue, alley, road, highway, or any of the foot pavements thereof, or the free entrance into any public or private building or enclosure; it shall not be lawful for any person or persons to curse, swear, or make use of any profane language or indecent or obscene words, or engage in any disorderly conduct in any street, avenue, alley, road, highway, public park or enclosure, public building, church, or assembly room, or in any other public place, or in any place where from the same may be heard in any street, avenue, alley, road, highway, public park or enclosure, or other building, or in any premises other than those where the offense was committed, under a penalty of not more than $25 for each and every offense.
 81 Cong.Rec. 8519 (1937).

60. See note 59, *supra.*

61. Near the onset of debate following introduction of his amendment, Senator Pittman stated:
 What the joint resolution seeks to do is to protect these sanctuaries and the diplomats and their families within them. It has no other purpose. I

plays of banners and placards.[62] At no time, however, did the Senator or any of his colleagues make any statement clearly indicative either of an intention to intercept mere utterances or an understanding that his amendment would do so.[63]

Some amount of discussion followed inquiries to Senator Pittman as to why his goals would not be attained by the amendment tendered by Senator La Follette.[64] That amendment, as we have said, would have forbidden some kinds of utterances as well as displays of some kinds of banners and devices.[65] The colloquies ensuing upon such inquiries underscore Senator Pittman's concern over picketing rather than speechmaking.

When Senator Vandenberg questioned Senator Pittman's reluctance to accede to Senator La Follette's substitute,[66] Senator Pittman replied:

> The Attorney General is very anxious to assure them that their homes will be safe from any attacks, that their families will be safe from any attacks or intimidation, and that their government shall not be brought into disrepute, and that odium shall not be placed upon them right in their faces by the display of placards and banners in front of their embassies or legations.[67]

When Senator Vandenberg pointed out that the La Follette amendment would "prohibit not only the things to which

> seek not to protect its occupants so much from insult as to provide for their safety, to protect against the arousing of the hatred of a people because of mistreatment of the representatives of their government, to protect them in the free and safe use and enjoyment of their sanctuaries.
>
> Mr. President, we have reports from the police department as to a number of incidents that have occurred here during the past year or so in front of various embassies. Not only do such incidents amount to discourtesy, not only is it what amounts to a refusal to protect and maintain the inviolability of the homes of ministers and ambassadors and their families, but it evidences a failure to protect their safety, when demonstrations in any form are allowed to be made before a legation or an embassy which are likely to incite mob violence.
>
> I do not believe that the people themselves who display the banners and placards have in their hearts the intention of doing injury or damage. What is the result of such display and such demonstration? Do Senators think the wife of the ambassador or the children of the ambassador in the building know the intent of the people who are marching up and down in front of the building, with all kinds of devices which display inscriptions that are critical of the ambassador or his country or which tend to bring into odium or disrepute their country or their ambassadors? Do Senators think the wife and the children know what the people who are on the outside are

> going to do? No. They are in their home in fear and trembling.
>
> As a matter of fact, I think we can prove, if it shall be necessary, that some foreign representatives have found it necessary to move their families away from their official homes during such periods of picketing.
>
> *Id.* at 8587.

62. The debate is replete with such references by nearly all of the participants. *Id.* at 8586–8593, *passim.*

63. There were two or three remarks which in isolation might be taken as hinting that perhaps a violation might occur without display of a placard or the like. See 81 Cong.Rec. 8589 (remarks of Senator Pittman), 8592 (remarks of Senator Barkley). By our appraisal, when read in context they do not, and in any event we would deem such vague allusions valueless. What for us is far more significant is the total absence during the lengthy debate of any statement plainly signifying either a purpose to so extend the interdiction or an understanding that the interdiction would be so broad. Compare United States v. Bass, *supra* note 39, 404 U.S. at 345–346, 92 S.Ct. 515.

64. See note 59, *supra.*

65. See note 59, *supra.* As Senator La Follette emphasized during debate, "[u]nder the amendment which I have offered they would be prevented from insulting anyone by word of mouth or by use of a banner, placard, device, or otherwise." 81 Cong.Rec. 8589 (1937).

66. 81 Cong.Rec. 8587 (1937).

67. *Id.* at 8587–8588.

[Senator Pittman's] resolution refers but a great many other things,"[68] Senator Pittman argued that the La Follette proposal,

> while it does not meet the material questions at all, is in the nature of an insult to the very principle and policy that the nations have recognized with regard to ambassadors and ministers since the beginning of government. We are to put them in the same position, it is understood, as passersby on the street; if the picketers do not indulge in any swearing or use obscene language, then the ambassadors or ministers have no right whatsoever to complain.[69]

And when Senator La Follette insisted that Senator Pittman "tell the Senate, if my amendment were agreed to, what could take place that . . . would . . . [be] objectionable if the police . . . enforced the law,"[70] Senator Pittman retorted:

> [You ask me] what they can do besides insult? What can they do without using obscene language? What can they do without swearing? Those are the acts against which [Senator La Follette's substitute] protects. What can they do? They can inscribe on a banner and hold it right in front of the entrance of an embassy.[71]

Thus Senator Pittman, the author and proponent of the amendment which ultimately became Section 22–1115, rejected a specific prohibition against oral communication.[72]

In the waning moments of debate, Senator La Follette focused on the part of Senator Pittman's amendment making it unlawful "to bring into public notice . . . any political, social or economic acts, views, or purposes of any foreign government, party, or organization, or to intimidate, coerce, harass, or bring into public disrepute. . . ."[73] Senator La Follette declared that Senator Pittman "has again and again indicated that he does not believe that the people in this country have the right or should have the right, no matter how well they conduct themselves, no matter how proper or appropriate their representations may be, to go within 500 feet of any premises occupied by the representative of any government accredited to this country."[74] Senator Pittman replied:

> There is hardly any use is discussing the matter any longer with the Senator. *The language shows that it refers to the carrying of banners or devices.* If the Senator still thinks that the offense is walking up and down, I cannot agree with him.[75]

The significance of this response derives from the fact that the language of the

---

68. *Id.* at 8588.

69. *Id.*

70. *Id.*

71. *Id.* at 8589.

72. Senator Pittman, during one of his retorts to Senator La Follette, denied that enforcement of the District's unlawful assembly law, D.C.Code § 22–1107 (1967), would achieve the goal of his amendment:

> But in some cases there has been no great assemblage. There were only five or six persons. They were not interfering with the traffic of the street. They were not using any language at all, but they carried placards which were critical of the governments represented by the embassies. Back and forward they walked, all day long. That is not illegal under any law of which I know. I am trying to have it made illegal, provided such devices and banners carry upon them a reflection on the government represented by the ambassador, and if they bring that government into odium, no matter whether or not there is now a law against it. It is not illegal picketing in any sense of the word, but it is calculated to frighten those within the building. It has frightened them, and such things should not be permitted. I do not believe we should allow the picketing of a foreign ambassador or a foreign minister or any picketing so close to him that it will cause fright.

> *Id.* at 8592.

73. *Id.*

74. *Id.*

75. *Id.* (emphasis supplied).

Pittman amendment to which Senator La Follette referred is outside the clause which contains the language "to display any flag, banner, placard, or device designed or adapted. . . ."[76]

Shortly after this duologue, the debate ended. Senator La Follette's substitute bill was voted down;[77] Senator Pittman accepted a proviso to his substitute[78] which, as thus modified, was passed.[79] The Pittman version then traveled the route to enactment without further change or debate.[80]

In sum, Section 22–1115 began as a committee-fashioned joint resolution framed in language which could leave no doubt as to its inapplicability to spoken as distinguished from written and symbolic communications. Although that formulation was soon displaced by Senator Pittman's amendment, which eventuated as the enacted measure, no difference in goals or proscriptions material to this case was urged or acknowledged. Although it was never said flatly that the Pittman substitute was limited to displays of banners and like paraphernalia, such events as possessed some degree of positivity suggest that it was.

And although throughout the long debate the participants constantly and consistently referred to picketing and demonstrating with banners and similar devices, we find not a single statement reliably indicating either advocacy or understanding that the Pittman measure would forbid spoken words.[81] So truly amazing that fact would be if the Pittman measure had been so intended that it is difficult to believe that it was.

## IV

■ Against this backdrop we measure the contentions of Zaimi and the Government—the latter assuming the burden[82]—that the prohibitions of Section 22–1115 extend to speech as well as other types of conduct transpiring without a permit within the geographical limits set by the section. The Government first asserts that since both the first and the third prohibitions refer to "any officer or officers,"[83] they become redundant unless the third is indulged operation without displays of the type the first concededly demands.[84] We cannot agree with this argument. We perceive no significant duplication in the two provisions,[85] and in any event the

---

76. See text *supra* at note 23, and notes 40, 41, *supra*.

77. 81 Cong.Rec. 8593 (1937).

78. The proviso was advanced by Senator La Follette and was accepted by Senator Pittman without objection. It read:
> *Provided, however,* That nothing contained in this joint resolution shall be construed to prohibit picketing, as a result of bona-fide labor disputes regarding the alteration, repair, or construction of either buildings or premises occupied, for business purposes, wholly or in part, by representatives of foreign governments.

*Id.* (emphasis in original).

79. *Id.*

80. See *id.* at 8728 (joint resolution—the Pittman substitute—referred by House to its Committee on Foreign Affairs); *id.* at 8792 (reported by Committee on Foreign Affairs without amendment); 83 Cong.Rec. 1575 (1938) (passed by

House); *id.* at 1678 (signed by Speaker of House); *id.* at 1681 (signed by Vice President); *id.* at 1746 (approved by President Roosevelt).

81. See note 63, *supra*, and accompanying text.

82. Zaimi simply adopts the Government's arguments in this regard.

83. See text *supra* at note 23 and notes 30–31, 40–41, *supra*.

84. See text *supra* at note 25.

85. The words "officer or officers" in the first prohibition, unlike those of the third, refer to officers, not only of "foreign government," but also those of "foreign . . . part[ies], or organization[s]." See text *supra* at note 23. So, while the two provisions do extend their protection to some of the same people, the first also embraces groups not touched by the third. Compare United States v. Bass, *supra* note 39, 404 U.S. at 342, 92 S.Ct. 515.

Government's interpretation would not remove it.[86] Moreover, "[w]hile courts should interpret a statute with an eye to the surrounding landscape and an ear for harmonizing potentially discordant provisions, these guiding principles are not substitutes for congressional law-making."[87] These considerations apply with even greater force to the Government's argument that the first and second prohibitions are redundant.[88] We cannot accept these or other feeble suggestions[89] as a panacea for the grave uncertainty bred by the statutory language and history in terms of any embargo on vocal acts.[90]

The Government resorts also to the congressional debates in an effort to buttress the construction it espouses. We are told that some of the remarks evince a purpose to proscribe not only picketing with banners and similar de-

vices but every form of conduct intruding upon the inviolability of diplomatic premises. Save for one misread colloquy,[91] the Government does not identify any remarks of that sort, and our own study of the debates has not enabled us to. Lastly, the Government refers to three isolated remarks during debate as demonstrations of a legislative intent to ban utterances. We have discussed those remarks previously,[92] and it suffices to repeat that we cannot read them so boldly.

More fundamentally, the Government's arguments miss the point. The crucial inquiry is not whether Section 22–1115 covers utterances ambivalently, but whether it "plainly and unmistakably" does so.[93] The governing principle is that penal statutes are to be interpreted with exactitude,[94] a rule deriving sustenance from considerations

86. If, as the Government contends, the third prohibition covered the entire spectrum of communication, it is obvious that the first prohibition would add nothing to the statute.

87. United States v. Bass, *supra* note 39, 404 U.S. at 344, 92 S.Ct. 515.

88. The first prohibition runs against bringing "into public odium any foreign government, party, or organization," and the second against bringing "into public disrepute political, social, or economic acts, views, or purposes of any foreign government, party, or organization." See text *supra* at note 23. The one protects the "foreign government, party, or organization" itself, and is complemented by the other's protection of their "political, social, or economic acts, views, [and] purposes." Compare United States v. Bass, *supra* note 39, 404 U.S. at 342–343, 92 S.Ct. 515.

89. The Government says the legislative debates reveal a central purpose to guarantee diplomatic personnel ingress and egress without hindrance, and that the fourth prohibition—a ban on "interfer[ing] with the free and safe pursuit of the duties of any diplomatic or consular representative of any foreign government," see text *supra* at note 23—cannot achieve this unarticulated purpose without inclusion of utterances within the activities it forbids. It seems to us more likely that if the statute emanated from

a purpose of that magnitude, somebody would have said so. The Government also says that since the five hundred-foot limitation and the permit requirement appear as modifying clauses after the first four prohibitions, the fact that the "display" requirement does not also appear there shows that the latter was not intended to apply to all of the prohibitions. We think this circumstance indicates little one way or the other.

90. See Parts II, III, *supra*.

91. This colloquy centered on the sufficiency of Senator La Follette's amendment to achieve Senator Pittman's objectives. See text *supra* at notes 64–71. Although Senator Pittman several times referred to picketing with banners and placards, not once during this colloquy did he mention communication merely by speech. See text *supra* at notes 64–71.

92. See note 63, *supra*.

93. United States v. Bass, *supra* note 39, 404 U.S. at 348, 92 S.Ct. 515, quoting United States v. Gradwell, 243 U.S. 476, 485, 37 S.Ct. 407, 61 L.Ed. 857 (1917).

94. United States v. Campos-Serrano, 404 U.S. 293, 297, 92 S.Ct. 471, 30 L.Ed.2d 457 (1971); United States v. Boston & M. R. R., 380 U.S. 157, 160, 85 S.Ct. 868, 13 L.Ed.2d 728 (1965); Smith v. United States, 360 U.S. 1, 9, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1959); FCC v. American Broadcasting Co., 347 U.S. 284, 296, 74

more ancient than the Nation itself. "Reasonable precision in the definition of crime has been regarded as a desideratum by free people since the early days of the common law." [95] Moreover, the specification of criminal offenses is peculiarly the business, not of courts, but of legislatures. [96] Criminal statutes are thus "to be construed strictly, not loosely;" [97] "[s]tatutes will not be read to create crimes . . . unless the purpose so to do is plain," [98] and "ambiguity" concerning the ambit of criminal statutes "should be resolved in favor of lenity." [99] Nowhere is the need for definitional precision greater than in situations where the statute intrudes upon an area which draws protection from the First Amendment. [100]

So it is that "one 'is not to be subjected to a penalty unless the words of the statute plainly impose it.' " [101] Criminal statutes are not to be broadened beyond the fair import of their language; [102] they "may not be held to extend to cases not covered by the

---

S.Ct. 593, 98 L.Ed. 699 (1954); United States v. Resnick, 299 U.S. 207, 209, 57 S.Ct. 126, 81 L.Ed. 127 (1936); Copper Plumbing & Heating Co. v. Campbell, 110 U.S.App.D.C. 177, 180–181, 290 F.2d 368, 371–372 (1961).

95. Ricks v. District of Columbia, 134 U.S. App.D.C. 201, 204, 414 F.2d 1097, 1100 (1968). This consideration not only underpins the canon of strict construction of criminal statutes but it also has achieved constitutional status on its own. As we stated in *Ricks*:

That precept, virtually from the birth of the Nation, has occupied a position of honor in the scheme of constitutional values, and for justifications of the highest order. Fluid language which sweeps citizens under the penumbra of penal legislation without warning is abhorrent. The imposition of criminal liability for behavior which a person could not reasonably understand to be prohibited offends the most rudimentary considerations of fairness. "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." Thus "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law."

*Id.* at 204–205, 414 F.2d at 1100–1101, quoting, in turn Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 2d 888 (1939), and Connally v. General Const. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926) (remainder of footnotes omitted). See also Grayned v. City of Rockford, 408 U.S. 104, 106–121, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

96. *E. g.*, United States v. Bass, *supra* note 39, 404 U.S. at 348, 92 S.Ct. 515; United States v. Boston & M. R. R., *supra* note 94, 380 U.S. at 160, 85 S.Ct. 868.

97. United States v. Boston & M. R. R., *supra* note 94, 380 U.S. at 160, 85 S.Ct. at 870. As the Supreme Court there stated, "[s]uch are the teachings of our cases from United States v. Wiltberger, 5 Wheat. 76 [5 L.Ed. 37], down to this day. Chief Justice John Marshall said in that case: 'The rule that penal laws are to be construed strictly, is, perhaps, not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department.' *Id.*, p. 95." See also cases cited *supra* note 95.

98. United States v. Noveck, 271 U.S. 201, 204, 46 S.Ct. 476, 477, 70 L.Ed. 904 (1926).

99. Bell v. United States, 349 U.S. 81, 83, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955). See also United States v. Bass, *supra* note 39, 404 U.S. at 347, 92 S.Ct. 515; Rewis v. United States, 401 U.S. 808, 812, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971).

100. See, *e. g.*, Interstate Circuit, Inc. v. City of Dallas, 390 U.S. 676, 684–685, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968); N.A.A.C.P. v. Button, 371 U.S. 415, 423–433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

101. United States v. Campos-Serrano, *supra* note 94, 404 U.S. at 297, 92 S.Ct. at 474, quoting Keppel v. Tiffin Savs. Bank, 197 U.S. 356, 362, 25 S.Ct. 443, 49 L Ed. 790 (1905).

102. United States v. Resnick, *supra* note 94, 299 U.S. at 209–210, 57 S.Ct. 126. See also Pierce v. United States, 314 U.S. 306, 311–312, 62 S.Ct. 237, 86 L.Ed. 226 (1941).

words used."[103] "Before one may be punished, it must appear that his case is plainly within the statute; there are no constructive offenses."[104]

It is evident that Section 22–1115, as applied to utterances, without more, does not meet these wholesome standards. Whatever meager conclusions as to its applicability to oral communications may be drawn from its text [105] and its legislative history,[106] it must be conceded that the section is seriously equivocal on that score. That, we think, is fatal to the conviction under review. We realize that disreputation may be wrought by word of mouth as well as by displays of signs and banners. But "[t]he fact that a particular activity may be within the same general classification and policy of those covered does not necessarily bring it within the ambit of the criminal prohibition." [107] On the contrary, "[w]e should not derive criminal outlawry from some ambiguous implication," [108] and "judicial enlargement of a criminal act by interpretation is at war with a fundamental concept of the common law that crimes must be defined with appropriate definiteness." [109]

At the very least, Section 22–1115 is equally conducive to dual interpretations. By one, oral communications do not impinge upon it; by the other, they may.[110] In our view, the case for the first construction is compelling. For "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." [111] As the Supreme Court has admonished:

This principle is founded on two policies which have long been part of our tradition. First, "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear." [112] Second, because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity. This policy embodies "the instinctive distaste against

---

103. United States v. Resnick, *supra* note 94, 299 U.S. at 209, 57 S.Ct. at 127.

104. *Id.* at 210, 57 S.Ct. at 127. See also Nelson v. United States, 109 U.S.App. D.C. 392, 395, 288 F.2d 376, 379 (1961).

105. See Part II, *supra.*

106. See Part III, *supra.*

107. United States v. Boston & M. R. R., *supra* note 94, 380 U.S. at 160, 85 S.Ct. at 870. See also United States v. Williams, 341 U.S. 70, 81, 71 S.Ct. 581, 95 L. Ed. 758 (1951); United States v. Weitzel, 246 U.S. 533, 542, 38 S.Ct. 381, 62 L.Ed. 872 (1918).

108. United States v. Universal C. I. T. Credit Corp., 344 U.S. 218, 221–222 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952). See also Toussie v. United States, 397 U.S. 112, 122, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970); Ladner v. United States, 358 U.S. 169, 178, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958).

109. Pierce v. United States, *supra* note 102, 314 U.S. at 311, 62 S.Ct. at 239. See also Kraus & Bros., Inc. v. United States, 327 U.S. 614, 621–622, 66 S.Ct. 705, 90 L.Ed. 894 (1946); Ricks v. District of Columbia, *supra* note 95, 134 U.S.App. D.C. at 204–206, 414 F.2d at 1100–1102.

110. See notes 40–41, *supra,* and accompanying text.

111. United States v. Universal C. I. T. Credit Corp., *supra* note 108, 344 U.S. at 221–222, 73 S.Ct. at 229. See also United States v. Bass, *supra* note 39, 404 U.S. at 347, 92 S.Ct. 515; United States v. Campos-Serrano, *supra* note 94, 404 U.S. at 297, 92 S.Ct. 471; Toussie v. United States, *supra* note 108, 397 U.S. at 123, 90 S.Ct. 858; Ladner v. United States, *supra* note 108, 358 U.S. at 177–178, 79 S.Ct. 209.

112. Quoting McBoyle v. United States, 283 U.S. 25, 27, 51 S.Ct. 340, 75 L.Ed. 816 (1931), and citing United States v. Cardiff, 344 U.S. 174, 73 S.Ct. 189, 97 L.Ed. 200 (1952).

men languishing in prison unless the lawmaker has clearly said they should." [113] Thus, where there is ambiguity in a criminal statute doubts are resolved in favor of the defendant. [114]

Perhaps the most striking circumstance in this case is that if Congress had really intended to forbid utterances, it would have been easy enough to have made that plain. Indeed, Senator La Follette did just that in the amendment which Senator Pittman flatly rejected. [115] Section 22–1115 meticulously specifies the consequences against which it erects protection for foreign governments and their representatives, and makes it crystal clear that at least some of its provisions are bulwarks against displays of written and symbolic communication, [116] but it nowhere mentions the spoken word as a prohibited medium.

Section 22–1115 thus stands in sharp contrast with the newly enacted Act for the Protection of Foreign Officials and Official Guests of the United States. [117] That legislation pursues objectives not essentially variant from those underlying Section 22–1115, [118] and provides for foreign emissaries in the states safeguards comparable to those afforded by Section 22–1115 and other statutes in the District. [119] One of the Act's provisions closely resembles Section 22–1115 but, very significantly, it puts in plain English its prohibition against "utter[ances]" of "any word, phrase, sound, or noise" as well as against "parades, pickets, [and] displays [of] any flag, banner, sign, placard, or device." [120] And the debates on the Act are replete with discussion of its circumscription on utterances, leaving no doubt as to the understanding and intent of Congress in

---

113. Quoting H. Friendly, Mr. Justice Frankfurter and the Reading of Statutes in Benchmarks, 196, 209 (1967).

114. United States v. Bass, *supra* note 39, 404 U.S. at 348, 92 S.Ct. at 522.

115. See text *supra* at notes 64–72, and note 59, *supra*.

116. See text *supra* at note 25.

117. Pub.L. No. 92–539, 86 Stat. 1070 (1972).

118. "The Congress finds . . . that harassment, intimidation, obstruction, coercion, and acts of violence committed against foreign officials, or family members in the United States or against official guests of the United States adversely affect the foreign relations of the United States." Act for the Protection of Foreign Officials and Official Guests of the United States, Pub.L. No. 92–539, § 2, 86 Stat. 1070–1071 (1972). See also Part III, *infra*.

119. "[T]his legislation is intended to afford the United States jurisdiction concurrent with that of the several States to proceed against those who by such acts interfere with its conduct of foreign affairs." Act for the Protection of Foreign Officials and Official Guests of the United States, Pub.L. No. 92–539, § 2, 86 Stat. 1070, 1071 (1972).

120. Section 301(c) of the Act, 18 U.S.C. § 112(c) (Supp. —— 19—), provides:

Whoever within the United States but outside the District of Columbia and within one hundred feet of any building or premises belonging to or used or occupied by a foreign government or by a foreign official for diplomatic or consular purposes, or as a mission to an international organization, or as a residence of a foreign official, or belonging to or used or occupied by an international organization for official business or residential purposes, publicly—

(1) parades, pickets, displays any flag, banner, sign, placard, or device, or utters any word, phrase, sound, or noise, for the purpose of intimidating, coercing, threatening, or harassing any foreign official or obstructing him in the performance of his duties, or

(2) congregates with two or more other persons with the intent to perform any of the aforesaid acts or to violate subsection (a) or (b) of this section, shall be fined not more than $500, or imprisoned not more than six months, or both.

Section 301(e), 18 U.S.C. § 112(e) (Supp. II 1972), however, limits the foregoing:

Nothing contained in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the first amendment of the Constitution of the United States.

that respect.[121] We perceive no reason why, had Congress intended Section 22–1115 to bar oral as well as demonstrative conduct, it could not have been similarly explicit.

 Section 22–1115, as we have said, clearly imposes a ban upon "congregat[ing]" within five hundred feet of "building[s] or premises" used or occupied by representatives of foreign governments and refusal "to disperse after having been ordered so to do by the police authorities."[122] We conclude that the remaining provisions of Section 22–1115, properly construed, come into play only where there is a "display" of a "flag, banner, placard, or device designed or adapted to" produce one or more of the several consequences specified in those provisions.[123] These demonstrative elements, we hold, are essential, and speech alone is not prohibited. The trial judge dismissed the count of the information charging Zaimi and Kalantari with "congregat[ing],"[124] and uncontroverted evidence at their trial demonstrates that neither did more than make utterances.[125] We do not reach the question whether Congress might validly proscribe conduct of the type in which Zaimi and his companion engaged.[126] We say only that in Section 22–1115 Congress has not done so.

The judgment of the District of Columbia Court of Appeals is reversed, and the case is remanded with instructions to dismiss the information against Zaimi.

So ordered.

WILKEY, Circuit Judge (concurring):

I concur in the result reached and in Judge Robinson's very scholarly and thorough opinion. The actions for which the appellant was charged and convicted simply were actions which were not intended to be prohibited by the language of the statute (D.C.Code, § 22–1115), which the legislative history, as of the 1937 date of enactment, makes clear, whatever the present or recent administrative understanding of the effect of the statute. The conviction therefore cannot be allowed to stand.

The fact that the recent administrative interpretation of this statute has not been the same as that now promulgated by this court, plus the enactment of certain legislation in October 1972, obliges me to raise a caveat.

It seems undeniable on the basis of Judge Robinson's careful legislative history research that the correct interpretation of § 22–1115 is that the prohibited conduct necessarily involves the display of a flag, banner, placard, or device designed to accomplish the prohibited objectives. This is the construction set forth in our opinion (footnote 41), it is supported by the construction of the original bill introduced by the Senate

121. See 118 Cong.Rec.H 7233–39 (daily ed. Aug. 7, 1972), S 15118–27 (daily ed. Sept. 18, 1972). See also the committee reports: S.Rep.No.1105, 92nd Cong., 2d Sess. at 18–19 (1972); H.R.Rep.No. 1268, 92nd Cong., 2d Sess. at 6–10, 16–18 (1972).

122. See text *supra* at note 24.

123. See note 41, *supra*.

124. See note 18, *supra*, and accompanying text.

125. See text *supra* at notes 8–10. We note, too, that the information did not charge the display of the banner which Zaimi at one time had. See text *supra* at notes 16–17 and note 9, *supra*.

126. Constitutional issues will not be addressed where adjudication of a nonconstitutional issue adequately disposes of the case. United States v. Thirty-Seven Photographs, 402 U.S. 363, 374, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971); Clay v. Sun Ins. Office, 363 U.S. 207, 209–211, 80 S.Ct. 1222, 4 L.Ed.2d 1170 (1960); Communist Party v. Subversive Activities Control Bd., 351 U.S. 115, 122, 76 S.Ct. 663, 100 L.Ed. 1003 (1956); Neese v. Southern Ry. Co., 350 U.S. 77, 78, 76 S.Ct. 131, 100 L.Ed. 60 (1955); Alma Motor Co. v. Timken-Detroit Axle Co., 329 U.S. 129, 136–137, 67 S.Ct. 231, 91 L.Ed. 128 (1946).

Foreign Relations Committee and Senator Pittman's substitute bill which ultimately became law, and by the dialogue between Senator Pittman and Senator La Follette, whose substitute bill (not adopted) would clearly have prohibited speech, gestures, or other acts to accomplish the objectives admittedly prohibited by § 22–1115. So much for the history at the time the statute was enacted.

My caveat is that this interpretation of D.C.Code § 22–1115 does not square with the new 1972 Act for the Protection of Foreign Officials and Official Guests of the United States,[1] quoted in pertinent part in footnote 120 of the court's opinion. The court's opinion comments, "That legislation pursues objectives not essentially variant from those underlying Section 22–1115, and provides for foreign emissaries in the states safeguards comparable to those afforded by Section 22–1115 and other statutes in the District." (Footnote references omitted.)

The 1972 Act for the Protection of Foreign Officials and Official Guests of the United States in its comparable provision (18 U.S.C. § 112(c)) begins: "Whoever within the United States *but* *outside the District of Columbia* and within one hundred feet of any building or premises belonging to or used or occupied by a foreign government. . . ." It then proceeds to prohibit among other things, "(1) parades, pickets, displays any flag, banner, sign, placard, or device, or utters any word, phrase, sound, or noise, for the purpose of intimidating, coercing, threatening, or harassing any foreign official. . . ." It seems to me that when the last Congress in October 1972 enacted a statute which "pursues objectives not essentially variant from those underlying Section 22–1115," but made that statute only applicable outside the District of Columbia, the Congress proceeded on the assumption that the existing statute in the District of Columbia provided the same protection for the foreign emissaries.[2] If that assumption be true, then Congress apparently assumed that, not only was the displaying of any flag, banner, sign, placard, or device which would intimidate, coerce, threaten, or harass a foreign official prohibited, but likewise prohibited by the existing D.C. Code § 22–1115 under which appellant Zaimi was convicted, erroneously as we now hold, were also actions described as

---

1. Public Law No. 92–539, 86 Stat. 1070 (1972). 18 U.S.C. § 112(c).

2. The legislative history of 18 U.S.C. § 112(c) strongly supports this analysis. In a report accompanying a predecessor bill that contained language identical to the bill that eventually became Section 112(c), the House Committee on the Judiciary made the following statement:

> [Section 112(c)] is not made applicable to the District of Columbia because a District law of long standing affords similar protection to foreign officials in the Nation's Capital. See D.C.Code, Section 22–1115, *supra*.

H.R.Rep. No. 1202, 92nd Cong., 2d Sess. 20 (1972). An even more significant statement was made in the Committee Report that accompanied the House Bill that eventually was enacted, with minor amendments, into law:

> The purpose of subsection 112(c) is to protect the peace, dignity and security of foreign officials when they are at their place of work. This provision would not apply to the District of Columbia *because the District law already affords even more extensive protection to foreign officials in the Nation's Capital.* (D.C.Code § 22–1115) While the District law has a "500-foot rule," the narrower radius has been adopted for the more general provision of this bill in order to minimize interference with the freedom on ingress and egress of individuals in the vicinity of foreign government offices in congested metropolitan areas.

H.R.Rep. No. 1268, 92d Cong., 2d Sess. 9 (1972) (emphasis added).

In a similar vein the Report of the Senate Committee on the Judiciary said the following:

> The provisions of subsection (c) are not made applicable to the District of Columbia because a District law of long standing affords similar protection to foreign officials in the Nation's Capital. (Section 22–1115, D.C.Code.)

S.Rep. No. 1105, 92d Cong., 2d Sess. 19 (1972).

"or utters any word, phrase, sound, or noise" for the same purposes.

If our opinion today is correct, then Congress by the 1972 legislation provided much more protection against harassment and intimidation for foreign emissaries *outside* the capital of our country than is now provided in Washington, D.C., itself. It is doubtful if Congress intended to do this. It appears that Congress in 1972 incorrectly assumed the interpretation of D.C.Code § 22–1115 as set forth in footnote 40 in our opinion today, which would have sustained the conviction of Zaimi. It is doubtful if Congress analyzed the D.C. statute as we do in footnote 41, which we hold correct and which is supported by the history of the enactment of that legislation in 1937.

If my comparison of D.C.Code § 22–1115 with the newly enacted Public Law No. 92–539 (1972) (18 U.S.C. § 112(c)) is correct, and Congress did enact the latter under a misapprehension as to the limited coverage of D.C.Code § 22–1115,[3] then Congress may make the protection of foreign emissaries in the nation's capital uniform with that afforded throughout the United States in one of several ways. Congress could repeal the limiting words "but outside the District of Columbia" of 18 U.S.C. § 112(c) and make clear that the new statute is designed to displace D.C.Code § 22–1115 as law in the District of Columbia also. Or, Congress could enact appropriate portions of Public Law 92–539 as part of the D.C.Code and repeal the present D.C.Code § 22–1115. Lastly, if in fact Congress is satisfied to have differing degrees of protection afforded foreign official guests inside and outside the national capital, then it can do nothing and permit the U.S.Code and D.C.Code provisions to reflect those differing degrees of protection.

---

3. The State Department likewise appeared to equate the 1972 national legislation with that already applying in the District of Columbia. In commenting on Public Law 92–539 after it had passed the House, in August 1972 the State Department Bureau of Public Affairs, in its publication "Foreign Policy Outlines," re "Protection of Foreign Diplomats" said: *Protection for missions*: Diplomatic missions in Washington are given a statutory protection (under D.C. law) which prevents demonstrations within 500 feet of their respective establishments, and are provided with a special Federal protection service along with local police protection. Similar protective measures for foreign missions outside Washington are incorporated in the current legislation. The anti-picketing ban is extended by the new legislation to diplomatic establishments in New York and elsewhere in the U.S., when the picketing is for the purpose of intimidating, coercing, or harassing any foreign official or obstructing him in the performance of his duties. Also, the radius provided in the new legislation for diplomatic missions outside Washington is reduced to 100 feet in the interest of allowing public access to buildings adjacent to missions in the more congested areas.